561 So.2d 1025 (1989)
David THORNHILL
v.
STATE of Mississippi.
No. 07-KA-58677.
Supreme Court of Mississippi.
November 22, 1989.
Rehearing Denied June 27, 1990.
*1026 Cotton Ruthven, Waller & Waller, Jackson, for appellant.
Edwin Lloyd Pittman, Atty. Gen., Jackson, Mike C. Moore, Atty. Gen., DeWitt Allred, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, C.J., and PRATHER and ANDERSON, JJ.
ROY NOBLE LEE, Chief Justice, for the Court:
David Thornhill was indicted and tried in the Circuit Court of Marion County on a charge of murder. The jury found him guilty as charged and the lower court sentenced Thornhill to life imprisonment. He has appealed from that judgment and conviction and assigns six (6) errors in the trial below.

Facts
In the early morning hours of October 26, 1986, Marion County Sheriff Webbie McKenzie, asleep in his home, was awakened by a telephone call from appellant, David Thornhill, his brother-in-law. Appellant related to the sheriff that he had received a telephone call from Paul Wayne Simmons, the victim, saying that Simmons was going to appellant's home. Appellant told the sheriff that, if Simmons came to the Thornhill home "there was going to be trouble;" that he hated to wake up the sheriff, but that he thought the sheriff should know there was going to be trouble. Sheriff McKenzie looked at his watch as it glowed in the dark and he determined that the time was 2:10 a.m.
The sheriff went back to sleep, the telephone rang again, and the call was from appellant. The following telephone conversation was recounted by the sheriff:
[David] said: "Well, you can come up here. I've killed Paul Wayne Simmons." I said, "You're kidding." He said, "No, I'm not." I said, "Well, maybe he's not dead." He says, "Yes, he is." I said, "Well, I'll be there in a few minutes."
Sheriff McKenzie got up and turned on the light. The time was 2:20 a.m. He called Detective Greg Cooper and asked Cooper to meet him at the Thornhill home. When the sheriff arrived there, he could see through the open door a body with the feet pointing toward him in the doorway and could see appellant in the room behind the body. As he went to check the body, appellant said, "Ain't no use to check him, he's dead."
Sheriff McKenzie examined the body and determined that Simmons was dead. He observed a head wound near Simmons' left temple, and a hammer in his right hand. Appellant showed the sheriff a.38-caliber pistol, saying, "Here's the pistol that I shot him with laying on the table, eating table." According to Sheriff McKenzie, appellant further told him that he had been "in the back room, the bedroom, and he heard the glass break. And he had his gun, come to the door, and then he saw Paul Wayne (Simmons) come at him with the hammer. And he says, `I shot him.'"
The sheriff called the dispatcher and requested that he contact one Mason Sistrunk, the district attorney's investigator and the Highway Patrol investigator and have them both come to the Thornhill home. He also called the coroner, Ed Laird, and told him to come there and further contacted the district attorney and told him about the homicide, what he had done, and asked whether or not to call the Crime Lab.
When Coroner Laird arrived on the scene, the door was open, there was glass on the porch. The sheriff, the sheriff's department investigator, appellant, and Novelyn Higganbotham, appellant's girlfriend, *1027 were there.[1] According to Coroner Laird, there was no glass on the soles of Simmons' boots, but there was glass on the body.
Mason Sistrunk, the district attorney's investigator, arrived at appellant's house at 3:08 a.m. The lights were on in the yard and the house. The victim's car was parked in the yard in front of the house. The lower right pane of the half-glassed front door was broken out with only a few shards remaining. Sistrunk observed several strike marks along the wood abutting the area where the lower right hand pane had been. He thought the marks had recently been made from a hammer blow. He found Simmons' body with a hammer in the hand lying just inside the house. Sistrunk found glass all over the top of the body and on the floor beside the body. He examined the body very closely and carefully and found no glass on the bottom of Simmons' boots, even though he said it was difficult to walk at the scene without stepping on and crunching glass. There were glass fragments in the hand that held the hammer. There was a large amount of glass on the victim's shirt  around the collar and down the shirt. Sistrunk carefully checked Simmons' body for cuts and bruises and found none. He conducted an especially careful examination of Simmons' hands and found no cuts or injuries to either hand, even though there was some dried blood on the left hand and blood splatters on the right wrist.
When Sistrunk arrived on the scene, he found Thornhill dressed in camouflage trousers, a camouflage jumper or coat, and bedroom slippers. He testified that Thornhill "was talking to himself. He talked the whole time. He continued to talk... . He was busy telling a person to call this one, call that one, and on the telephone and he said he  this man come in on him and broke in the house on him and he shot him. And he continued to talk about this." When asked where Simmons got the hammer, Thornhill told Sistrunk that the hammer was one that he (Thornhill) had kept out on his porch by a dog feeder box to use in opening the hard-to-open metal box.
David Wynn, investigator with the Mississippi Highway Patrol, arrived at the Thornhill house approximately ten minutes after Sistrunk had arrived. He, too, examined the body and found glass on the top of the body and in the right hand with the hammer, and he also found no cuts on either hand or arm and no glass on Simmons' boot soles. He examined the weapon Thornhill said he had used and found the cylinder closed and containing five live rounds of wadcutter ammunition and one spent hull. At 3:40 a.m. (before Simmons' body was moved), Wynn read Thornhill his Miranda rights and took a tape-recorded statement from him.
According to appellant, Simmons came to Thornhill's home about 10:00 a.m. on October 25, and they spent most of the day together. Appellant's statement indicated that he and Simmons were planning to cook steaks with Novelyn Higganbotham and another woman, but eventually wound up that evening at a party at Tim Singley's camp; that while there, Simmons "got belligerent, tried to jump on Steve Crawley, and then he started on me;" that he told Simmons to "find another ride home and pick up his car and don't come back to my house;" that Simmons got somebody to take him (Simmons) to pick up his car at the Thornhill house "but before he did, he told me what to do with it, like he'd see me a little later;" that Simmons "had done told me before he got here that he would come see me and tend to me, by a threat, and he threatened  and they'll tell you he threatened me. There were about twelve people at the party that could tell you that, and I can give you every one of them's name;" that before Simmons came back to pick up his car, Thornhill had called Sheriff McKenzie and told him, "I felt like that he was going to come back and try something;" that his first call to the sheriff was made about 1:00 a.m. or 1:30 a.m.

*1028 Law

I.

WAS THE JURY INSTRUCTION ON MALICE AFORETHOUGHT ERRONEOUS AND THEREFORE REVERSIBLE ERROR?
The instruction S-5, the subject of this complaint, follows:
The Court instructs the Jury that while malice aforethought is a necessary ingredient to the crime of murder, that malice aforethought does not necessarily mean hatred or ill will and need not exist in the mind of the defendant for any definite time, not for hours, days or even minutes, but if there is malice aforethought and a premeditated design to kill and it exists in the mind of the defendant but for an instant before the fatal act, this is sufficient premeditation and malice aforethought to constitute the offense of murder, unless the killing is justifiable.
The appellant cites Patterson v. State, 289 So.2d 685 (Miss. 1974), and Bangren v. State, 196 Miss. 887, 17 So.2d 599 (1944), for the proposition that the instruction on malice must require that the jury find that malice had preexisted the unlawful act which preceded the fatal shooting. Those cases are distinguished from the case sub judice. In Patterson, the instruction indicated that malice did not have to exist for a given length of time provided it existed "at the very moment the fatal shot was fired." The Court made it clear that malice must pre-exist the fatal shooting. Likewise, in Bangren, the Court said:
To constitute murder, the malice must precede the unlawful act which is being attempted or committed by the person killed when the killing is done in resisting his attempt to do an unlawful act.
196 Miss. at 897, 17 So.2d at 600.
In the case sub judice, the instruction stated that the premeditated design to kill must exist in the mind of the defendant before the fatal act, if but for an instant. Further, in Bangren, the Court held that the lower court was in error for refusing a requested manslaughter instruction when it concluded the question for the jury was whether or not the defendant used more force than reasonably appeared to be necessary in ejecting a trespasser from her home. Here, (1) no manslaughter instruction was requested, and (2) there is an issue as to whether or not Simmons was committing an unlawful act when he was shot and killed by Thornhill. The State's theory of the case sub judice was that appellant lured Simmons to his home with the deliberate design to murder him and the defense theory was that Thornhill's shooting of Simmons was justifiable homicide in response to his finding that Simmons had broken into his home and was standing in his hallway holding a hammer. Considering those two theories and the facts of this case, appellant could not have been harmed or prejudiced even with the Patterson instruction, i.e., under the State's theory, the malice would have existed long before the fatal shooting and under the defense theory, it never existed.
The assigned Error I is rejected.[2]

II.

WAS IT ERROR TO ADMIT A TAPE RECORDING OF THE APPELLANT, AND OTHER PERSONS, WHO WERE PRESENT ON THE NIGHT THAT THE ALLEGED MURDER TOOK PLACE? UNDER THE PARTICULAR CIRCUMSTANCES OF THIS CASE DID THE COURT COMMIT FUNDAMENTAL ERROR BY ALLOWING THE TAPE RECORDED STATEMENT OF THE APPELLANT AND OTHERS INTO EVIDENCE?
Investigator David Wynn taped the interview and statement of appellant after advising him of his rights. The statement was an account of the activities of appellant and Simmons during the approximately sixteen (16) hours prior to the shooting. It was the primary evidence of the defense theory of the case, i.e., that the shooting *1029 was done in self-defense. The lower court conducted a lengthy and thorough suppression hearing in which the appellant did not challenge the voluntariness of the statement or the waiver of the right to remain silent or to have counsel present. At trial the defense objected to the admission of the tape was (1) because it contained statements by persons other than Thornhill, (2) because the tape was turned off at two points and there was some discussion between appellant and the investigator while the tape was off, and (3) because the defense thought that a typed transcript, though not verbatim, would be better evidence than the tape itself. The lower court made a complete and well-reasoned ruling on each objection and we are of the opinion that he did not abuse his discretion in overruling the objection and admitting the taped statement.
On appeal here, the appellant's objections to the admission of his tape-recorded statement are based on different grounds than those presented to the trial court, i.e., that he was denied the fundamental right to a fair trial because its admission (1) created a situation in which the defendant was, in effect, forced to testify (through the tape), but was deprived of his right to the Weathersby presumption; (2) allowed inadmissible hearsay evidence on the part of the defendant and others to be presented to the jury, and (3) allowed the prosecutor to obtain a conviction not on substantive evidence, but on contrived impeachment of the tape-recorded statement on collateral matters. It is elementary that different grounds than the objections presented to the trial court cannot be presented for the first time on appeal. Warren v. State, 456 So.2d 735, 738 (Miss. 1984), Ponder v. State, 335 So.2d 885, 886 (Miss. 1976).
Appellant's principal argument under this assignment is that, because the tape was neither a confession, an admission, or statement against interest, the tape-recorded statement is hearsay and admissible only for the purposes of impeachment. He cites no Mississippi case to support this claim. Rule 801(d)(2)(A), Miss.R. of Evid., provides that a statement is not hearsay, if it is a party's own statement offered against him. In Jackson v. State, 551 So.2d 132 (Miss. 1989), this Court held that it was proper to admit a police officer's description of the defendant's reenactment of his version of events involved in his wife's killing. Jackson held that the reenactment was an admission ("[i]t is the accused's enacted expression of just what happened") even though the enactment was exculpatory insofar as Jackson's version of events was believed to be true. Here, appellant's version of events is, if believed, exculpatory. A statement of a party need not be against interest when made, i.e., may have been self-serving when made. 4 Weinstein's Evidence ¶ 801(d)(2)[01] (1988). See United States v. Slone, 833 F.2d 595, 601 (6th Cir.1987).
Appellant contends that the introduction of the tape-recorded statement "in conjunction with the denial of the Weathersby presumption was clear, fundamental and highly prejudicial reversible error." A discussion of the Weathersby rule follows under assigned Errors III and IV. There is no merit to this claim.
We note that after the jury was selected in this case, counsel for appellant, in making his statement to the jury, said the following:
You will hear the Defense version of what happened out there that night. It's going to be the only accurate version because David Thornhill was the only eyewitness, the only person who really knows what happened out there that night. Now, other people might have seen what happened at this party, some of the things that happened between the time of the party and the time of the incident. But, no one saw what happened except David Thornhill.
After the taped statement was admitted into evidence, the strategy of the appellant was to rely upon the statement rather than having the appellant testify before the jury. He also obtained an instruction D-12, which told the jury:
The Court instructs the jury that it must not consider the fact that the Defendant, David Thornhill, did not testify *1030 as evidence against him, and that no inference of any kind may be drawn from the fact that the defendant did not testify in this case.
The strategy of the appellant was such that he had his cake and ate it, too.
The assigned Error II is rejected.

III.-IV.

DID THE LOWER COURT ERR IN FAILING TO DIRECT A VERDICT, RENDER A PEREMPTORY INSTRUCTION, OR GRANT A NEW TRIAL FOR APPELLANT?

WAS THE VERDICT OF THE JURY AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?
Assigned Errors III and IV raise the issues of whether or not the lower court committed error in declining to direct a verdict of not guilty and in declining to grant a new trial on the ground that the verdict was against the overwhelming weight of the evidence. The points will be combined for discussion.
The appellant argues that this is a case for application of the Weathersby rule, which was first stated in Weathersby v. State, 165 Miss. 207, 147 So. 481 (1933). His version of the facts appears in the record from his taped statement. Appellant did not testify at the trial. In Jackson v. State, 527 So.2d 654 (Miss. 1988), the Court said the following with reference to the Weathersby rule:
The appellant contends the court erred in refusing to grant him a peremptory instruction following the rule stated in Weathersby v. State, 165 Miss. 207, 147 So. 481 (1933). That rule follows:
Where the defendant or the defendant's witnesses are the only witnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the State, or by the physical facts, or by the facts of common knowledge.
165 Miss. at 209, 147 So. at 482.
In Berry v. State, 455 So.2d 774, 776 (Miss. 1984), we said: "This Court has stated that it is a rare case that meets the requirements of Weathersby." In the case sub judice, the evidence introduced by the State conflicts with the version advanced by the appellant and removes the case from the Weathersby rule... .
527 So.2d at 658. See also Jackson v. State, 551 So.2d 132 (Miss. 1989).
In determining whether or not a jury verdict is against the overwhelming weight of the evidence, this Court must accept as true the evidence which supports the verdict and will reverse only when it is convinced that the circuit court has abused its discretion in failing to grant a new trial. Malone v. State, 486 So.2d 360, 366 (Miss. 1986); Shive v. State, 507 So.2d 898, 900 (Miss. 1987); and Uniform Criminal Rules of Circuit Court 5.16.
In order to determine whether appellant Thornhill is entitled to acquittal or a new trial as a matter of law, it is necessary to examine the evidence which contradicts or is inconsistent with his version of the events. Thornhill's version of the killing is that he shot Simmons in self-defense after Simmons had broken the glass in the door and entered the Thornhill house. There is no dispute that Thornhill shot and killed Simmons; the dispute is whether the killing was self-defense or murder. The State presented evidence that there was glass on top of Simmons' body but there was no glass underneath it and no glass on the soles of his boots; that there were no prints on the hammer held by Simmons, that Simmons' hand was not gripping the hammer, and that there were no cuts on Simmons' arms and wrists; that there was no weapon on or near Simmons' body other than the hammer which was one which Thornhill normally kept on his porch.
The appellant's counsel attempted to show that the glass could have ended up on top of Simmons' body by virtue of its having fallen on the body when the front door was opened and closed by law enforcement investigators. Evidence offered by the State to refute that theory included testimony *1031 that the front door was open when Sheriff McKenzie arrived, and was open when Coroner Laird arrived; that when Laird arrived virtually all of the glass was out of the frame; that the door was not closed or opened between the time Laird arrived and at the time when the body was removed. The jury could have found it implausible that a belligerent and threatening man would go to appellant's house to pick up his car and then drive to his own home and still later return to appellant's house to carry out a threat and that he would go there without a weapon. Since appellant was, by his own admission, waiting with the gun for Simmons to arrive, the jury could have believed that even if Simmons had broken into the house and was holding the hammer in a menacing way, appellant had no reasonable grounds to apprehend a design on the part of the victim to do him some great bodily harm and/or that there was no imminent danger of such design being accomplished. Appellant Thornhill, by his own admission, shot Simmons virtually on sight:
Mr. Thornhill: I come from that other bedroom door and I met him there about that little closet door, and he had the hammer drawed back and I shot him. And he spun around and fell right where he's at.
* * * * * *
Mr. Wynn: Did you hear him say anything at all?
Mr. Thornhill: Oh, no. He come in here to hurt me.
Mr. Wynn: But he didn't say anything?
Mr. Thornhill: He didn't have time.
* * * * * *
Mr. Wynn: When you came around the corner, did you turn the light on before you shot him, or you shoot in the dark?
Mr. Thornhill: I shot in the dark. Because he didn't have no business in my house.
Mr. Wynn: Did you know who it was when you shot him?
Mr. Thornhill: As far as saying positive, no. But I knew it was him `cause that light in there was dim, you know, the lamp was dim, it was dim. But, I mean, I knew it was him. And I knew what he come for.
Along with the testimonial and physical evidence concerning the crime scene, the jury might, from a variety of other evidence, have found appellant's version of events less than credible. For example, Simmons received a call at his home shortly before leaving in the early morning, though appellant told Sheriff McKenzie that Simmons made a telephone call and told Wynn and Sistrunk nothing about a phone call but, instead, told them that Simmons' threat had been made face-to-face at the party. Appellant said he changed clothes after he arrived home from the party. The jury could have inferred that appellant changed his clothes because he had glass or blood or both on the clothes he had been previously wearing. Appellant gave no explanation for putting on the camouflage outfit to await Simmons' return. The jury might also have found it less than believable that appellant would call the sheriff to announce that there was going to be trouble.
Appellant attempted to show that Simmons was a drug user who was angry at and seeking retribution against appellant because appellant was working as an informant for the State Narcotics investigators. The State offered evidence that appellant had volunteered to serve as an informant but had never "made a case." Appellant contended that Simmons was a "needle-using" drug abuser. But the examination of the body and the toxicological screen at autopsy showed no evidence of drug use other than marijuana.
Appellant told investigator Wynn that there were about twelve (12) people at Tim Singley's party, who could tell Wynn about the threats, and that he could give Wynn every one of their names. Wynn investigated all of the people named by appellant as having witnessed a dispute at the party between appellant and Simmons, and he found only one person, Parker Ball, who heard Simmons and Thornhill arguing and all that argument amounted to was something about $300.00.
*1032 We are of the opinion that, considering all of the evidence favorable to the State's case and excluding that evidence favorable to the appellant's theory, that a guilt issue was established for determination by the jury, and that the verdict of the jury is supported by the evidence and is not contrary to the overwhelming weight of the evidence.
The assigned Errors III and IV are rejected.

V.

DID THE COURT ERRONEOUSLY ALLOW CORONER ED LAIRD TO TESTIFY CONCERNING "A DEATH GRIP" OVER THE OBJECTION OF THE DEFENSE?
Miss.Rules of Evidence 701 provides the following:
If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to the clear understanding of his testimony or the determination of a fact in issue.
As to expert testimony, Rule 702 provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.
The reference to a "death grip" was mentioned three times during the trial. The grip referred to the handle of a hammer which was in the right hand of the victim as he lay dead on the floor. Without objection, Mason Sistrunk testified:
Q. Was the hand  when you saw it, when you originally saw it  was it clasped around the hammer, or was the hammer laying [sic] in the hand?
A. The hammer  the hand was not gripping tight, but it was just in this  was not a death grip or anything like that, just loosely in his hand, and just about like this (indicating).
The second reference to the death grip was on the defense cross-examination of Dr. James McGehee, the pathologist who had performed the autopsy:
Q. Are you familiar with the neurological phenomenon  and I don't know the specific name for it; I'm not an expert in this field  but it's a neurological grip where you have a head wound.
A. Yes, I'm aware that that does happen, but I  I don't have  to the limits of my knowledge, that is not always  does not always occur and so I don't think I could make  I personally couldn't make a statement that it does or does not occur in all instances.
Q. Sure, sure. But just generally, isn't it true that where you have massive head trauma that there are involuntary reflexes to the extremities?
A. Yes, that does 
Q. And the hand will grip an object?
A. That does happen, but I don't know in what percentage of cases that it does.
The third reference to the "death grip" came during the testimony of Winston Laird, the coroner. On direct examination by the State, the following colloquy occurred:
Q. How was the hand clenched around the hammer?
A. Well, it was  it was just more in this position like this (indicating). It wasn't a real tight grip. It was just kind of an open grip.
Q. It was not a death grip?
A. No, sir.
MR. COOPER: Your Honor, we object to that. He's not qualified to testify what a death grip is.
MR. DOUGLASS: Now, they asked the same question of the other witnesses.
A. I have seen many death grips.
THE COURT: Excuse me just a minute. I'll sustain the objection unless the State wants to qualify him as to how many times he's had a chance to observe death *1033 grips and what study he's made of that and articles he's read.
MR. DOUGLASS: We won't go into that then, Your Honor.
A. I have been a Coroner six years and I have completed several seminars on death investigation.
MR. COOPER: I'm going to object to his making these ex parte statements when he's not been asked a question.
THE WITNESS: Oh, I'm sorry. I thought they wanted me to.
Q. O.K. I'll ask you then: would you explain your qualifications as a Coroner?
A. I have been Coroner now going on six years and I finished all the death investigation seminars; and that's something we are taught in those seminars is the difference in the grip and the different causes of that.
Q. Have you seen incidences or been to school on incidences of death grip?
A. Yes, sir. And drowning grips and things of that sort, and there are some of them that are different.
Q. What type of degree or qualifications did you receive from those seminars?
A. Completed a form stating that I had completed them with "Satisfactory." I have the diplomas in my office.
Q. Have you been to actual scenes yourself that occurred?
A. Yes, sir.
Q. In this county?
A. Yes, sir.
Q. With that in mind, in your opinion, was there a death grip 
MR. COOPER: We're going to object, Your Honor. We don't think the proper predicate has been laid to qualify him as an expert in that field.
THE COURT: All right. I'll overrule the objection.
MR. COOPER: It's a neurological thing even the doctor couldn't testify to.
THE COURT: Well, I'll overrule the objection. The jury can give to it whatever they want and you can examine him as to how accurate his testimony is.
MR. DOUGLASS: (Continuing)
Q. Mr. Laird, the court will allow you to testify. In your opinion, was that a death grip?
A. No, sir, I don't think it was. In my opinion, I really don't.
Appellant concedes that the qualification of an expert witness as to whether or not he may testify as an expert lies largely within the discretion of the trial court and will not be considered error unless that discretion is clearly abused. Hollingsworth v. Bovaird Supply Co., 465 So.2d 311 (Miss. 1985). Appellant contends that allowing such testimony here was highly misleading and prejudicial "where the coroner in response to a question on cross-examination `now have you ever been to medical school' replied, `Yes, sir' then went on to state `at the academy there in Jackson, the Law Enforcement Academy'."
Appellant omits from his brief the following questions on cross-examination which served to clarify the earlier responses about medical training:
Q. How much medical training  what type medical training did you receive?
A. On different types of criminal investigations; and also in the service as a medic.
Q. Have you ever had any neurological training?
A. No, sir.
In Jordan v. State, 464 So.2d 475 (Miss. 1985), the Court said:
[T]o be qualified to testify as an expert, a witness need not be infallible nor possess the highest degree of skill, it being generally sufficient that he possess peculiar knowledge respecting matter involved not likely to be possessed by the ordinary layman.
464 So.2d at 486.
State's Exhibits 12 and 13 are two large blown-up color photographs of the victim's body lying on the floor. Particularly shown are the victim's right hand and the hammer lying in the hand. Members of the jury, the judge and members of this Court can observe the hand holding a heavy hammer and make a determination of whether or not the hammer was held in *1034 a "death grip", e.g., tightly-closed fist. It is apparent in the photographs that the heavy hammer was lying loosely in the palm with the fingers slightly curled along the sides of the hammer.
The assigned Error V is rejected.

VI.

DID THE DISTRICT ATTORNEY COMMIT FUNDAMENTAL ERROR IN CLOSING ARGUMENT?
The appellant contends that the following comment made by the district attorney during closing argument constitutes error:
How many times in your life have you heard the old saying, "Well, shoot them and then drag them in. Make sure they're inside; make sure they're across the front stoop; make sure they're across the doorway because then you can get off." How does that remind you of this case? Folks, it is right there. It is right there in living color on that board.
Although the appellant made no objection to this comment or any other argument of the prosecuting attorneys during closing argument, he now assigns it as error on this appeal. Failure of the appellant to make an objection to the argument of the district attorney fails to preserve the point for consideration by this Court. Messer v. State, 483 So.2d 338 (Miss. 1986). Therefore, the point is procedurally barred.
However, had an objection been made, we are of the opinion that there would be no reversible error. Attorneys are permitted wide latitude in arguing their respective positions and theories to the jury, if they follow facts and inferences flowing from those facts. Campbell v. State, 437 So.2d 35 (Miss. 1983); Pierce v. State, 289 So.2d 901 (Miss. 1974). In our opinion, the district attorney's argument was following his theory of the case, which he attempted to prove by witnesses, exhibits, and inferences from the evidence. We think there is no merit in this argument.
The assigned Error VI is rejected.
Having reviewed the record and briefs and having heard the argument of counsel for the State and appellant, we find no reversible error committed by the trial court below. Therefore, the judgment of the lower court is affirmed.
AFFIRMED.
HAWKINS, P.J., PRATHER, ROBERTSON, SULLIVAN, ANDERSON and BLASS, JJ., concur.
PITTMAN, J., not participating.
DAN M. LEE, P.J., dissents without written opinion.
NOTES
[1] Novelyn Higginbotham was asleep in appellant's bed in the bedroom at the time of the homicide.
[2] The State contends that there was no proper objection to the instruction S-5 because the objection was vague and unspecific; and that the contention is procedurally barred. The bar appears to have merit.