# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-KA-00420-SCT

*BABY BOY MOORE a/k/a LAVELL*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/07/2021 |
| TRIAL JUDGE: | HON. CALEB ELIAS MAY |
| TRIAL COURT ATTORNEYS: | STEVEN SIMEON KILGORE |
| | MITCHELL DEE THOMAS |
| | WALTON WADE WHITE |
| COURT FROM WHICH APPEALED: | NEWTON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: HUNTER NOLAN AIKENS |
| | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALEXANDRA LEBRON |
| DISTRICT ATTORNEY: | STEVEN SIMEON KILGORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 09/29/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**KING, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Baby Boy Moore appeals his conviction of aggravated assault and argues both that the verdict was against the overwhelming weight of the evidence and that the prosecutor erred by using Moore's past convictions as impeachment evidence. Because Moore's claims lack merit, we affirm his conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

¶2.    A Newton County Grand Jury indicted Moore for aggravated assault on January 27, 2020. On March 15, 2021, the jury found Moore guilty as charged. The trial court sentenced Moore to serve a term of eight years in the custody of the Mississippi Department of Corrections, with six years suspended.[1]

¶3.    At trial, Edward Eugene Smith testified that, on the morning of January 28, 2019, he was at Rick Chesney's house in Union, Newton County, where he periodically stayed.[2] Smith had stayed at Chesney's house the night before. Around 8:00 a.m., Smith testified that he was preparing to leave to take Chesney to the doctor. He stated that he was getting in on the driver's side of Chesney's car, when Moore walked up and tried to stab him. Smith testified that he had not seen Moore until he was approximately three to five feet away and that Moore had "caught me off guard and he stabbed me." Smith stated that Moore told him he was going to kill Smith. Smith fought with Moore for a short time and did not realize that he had been stabbed until he heard his "blood gurgle" because his lung had been punctured. According to Smith, the entire altercation lasted approximately fifteen seconds. Smith averred that he did not have any type of weapon and that he had not tried to stab Moore at any point.

¶4.    Smith testified that he and Moore were acquaintances. Smith stated that he did not get along with Moore and that they did not like each other but that it was "[n]othing major." He

---

[1]Counsel for Moore states that Moore is not currently incarcerated.

[2]Rick Chesney is also referred to as Ricky Chesney throughout the record.

testified that the two had never fought or argued previously. Smith did not know of a reason for Moore's actions but stated that Moore "had made his own opinion about me before he knew me . . . ." Smith again confirmed that he did not know of anything that could have been interpreted to provoke Moore. A surveillance tape at the nearby Tobacco Mart captured the altercation. Smith confirmed that the surveillance tape accurately portrayed the events that had occurred that morning.

¶5.    Smith admitted that he wrote a statement that contradicted his in-court testimony in some ways. Smith's statement read:

> Myself and Ricky Chesney were in the process of about to be headed to Decatur to the court for Mr. Rick. Rick was already in the car, I was about to be getting in the car when he (Baby boy) tried to stab me from behind. I noticed a glare from the knife blade over my left shoulder, then I just reacted. I tried to defend the blade best I could but eventually he got the best of me! The blade finally went 4 ½" into my left side hitting my lung. Baby boy saying "I'm fixing to kill you now!" Then I just laid on the ground and tried to stay calm as I could because all I could hear was gurggling [sic] sounds coming from my chest and blood and air bubbles and so forth!!

¶6.    Chesney resided at 406 South Decatur Street in Newton County, next door to a Tobacco Mart. Chesney testified that the morning of January 28, 2019, he and Smith were getting ready to leave to go to Philadelphia to get a car part. Chesney stated that he was in the passenger seat of the car and that Smith was sitting on the driver's side when Chesney saw Moore walking toward Smith. Chesney testified that he had seen Moore "a time or two" but did not know him personally and did not have any problems with him in the past. Chesney testified that Smith "got up and went to meet [Moore] and all. I thought he was

3

gonna talk to him or something or another. That's when they went to fighting."

¶7.    Chesney testified that he did not hear Smith or Moore say anything before fighting. Chesney stated that the two were fist-fighting and kicking when Moore pulled out a pocketknife and stabbed Smith. Chesney did not see Smith with a knife and stated that Smith had not had a weapon at any time during the altercation. Chesney also said that he did not see Smith provoke Moore into fighting. In Chesney's opinion, the altercation lasted approximately fifteen minutes.

¶8.    Mike Smith, a supervisor for the City of Union Public Works, testified that he had seen the altercation while he was driving past Chesney's house and that he had called the police. Mike did not see any weapons and did not stop to watch the fight. However, Mike testified that he drove back to the scene and saw Smith lying face-up in the parking lot of the nearby Tobacco Mart. The police had already arrived at that point.

¶9.    Mitch Kennedy, assistant chief at the Union Police Department, testified that on January 28, 2019, he had been dispatched at approximately 8:00 a.m. regarding a disturbance on 406 South Decatur Street behind the Tobacco Mart. Assistant Chief Kennedy testified that when he arrived, Smith was lying on his back behind the Tobacco Mart bleeding from a stab wound in his abdomen. Smith informed Assistant Chief Kennedy that Moore had stabbed him. Assistant Chief Kennedy was not familiar with Moore at that time. Assistant Chief Kennedy testified that he checked Smith for weapons and found a pocketknife in his pocket. No other weapons were recovered in the area.

4

¶10. Assistant Chief Kennedy testified that when Investigator Lawrence Card, with the Union Police Department, arrived, the two began looking for Moore. Approximately fifteen to twenty minutes later, Assistant Chief Kennedy and Investigator Card located Moore at the Chevron at the junction of Highways 15 and 492 and took him into custody. Assistant Chief Kennedy stated that Moore had a knife in his hand at that time. Assistant Chief Kennedy did not observe any injuries on Moore, and he was not taken for medical treatment.

¶11. Investigator Card testified that, on the morning of the incident, he responded to Mike's call regarding an altercation on South Decatur Street. When Investigator Card arrived, he observed Assistant Chief Kennedy standing near Smith, who was lying on the ground in the parking lot of the Tobacco Mart. Investigator Card did not find any weapons on Smith. Investigator Card testified that it was his understanding that Smith and Chesney had intended to go to a court appearance that morning.

¶12. Investigator Card stated that he and Assistant Chief Kennedy were informed that Moore's pastor, who also lived on South Decatur Street, had taken Moore to the Chevron. When they arrived Moore presented the knife and laid it on the ground. Moore then was taken into custody without incident. Investigator Card also testified that Moore did not have any apparent injuries.

¶13. Investigator Card obtained a surveillance video from the Tobacco Mart that showed a "very grainy video" of the incident. That evening, Investigator Card spoke with Smith at the hospital. In addition to Smith's puncture wound, Investigator Card noticed "lacerations

5

on his neck" and "what appeared to be a wound of some type around his navel." Smith also had "some type of skin irritating mark under his left eye and what appear[ed] to be a scratch on his nose."

¶14.   Investigator Card testified that Smith had admitted during an interview that he had a pocketknife in his pocket. However, Investigator Card's police report stated, "Mr. Smith stated that he had several kni[v]es in his pocket, none of which he attempted to use on the accused."

¶15.   Moore testified that the morning of the altercation, he had been walking down Decatur Street to go to his pastor's house when Smith "called me an N word and said my mama was a whore . . . ." Moore stated that Smith did this often and that Smith "starts something with me all the time." Moore crossed the street "to fistfight" Smith. Moore testified that Smith ran to meet him, pulled out a knife, and tried to use the knife on him. Moore testified that Smith was trying to kill him. He stated that he pulled his knife out only after Smith pulled out a knife.

¶16.   Moore stated that, after the altercation, he left the scene to go to his pastor's house. Moore and his pastor then left to go to the Chevron to get gas. Moore stated that while they were at the gas station, the pastor's wife called to say that the police were at her house. Moore then waited at the Chevron for the police to arrive.

¶17.   Moore testified that Smith did not like him because Smith had been shoplifting from the church store where Moore worked and because Moore had stopped him from stealing.

6

Moore said that he had previously witnessed Smith display a knife at church. He stated that on another occasion, Smith had threatened him with a knife and a stick but that Moore was able to get away. Moore also testified that Smith had tried to run him over at one point and that he had reported the incident to the police, but nothing further had happened in relation to that incident.

## ISSUES

I. Whether the verdict was against the overwhelming weight of the evidence.

II. Whether the prosecutor's impeachment using Moore's prior convictions warranted a new trial.

## ANALYSIS

**I. Whether the verdict was against the overwhelming weight of the evidence.**

¶18. "When reviewing challenges to the weight of the evidence, this Court views the evidence 'in the light most favorable to the verdict.'" ***Pulliam v. State***, 328 So. 3d 93, 97 (Miss. 2021) (quoting ***Little v. State***, 233 So. 3d 288, 292 (Miss. 2017)). "This Court will not disturb a jury verdict on a weight-of-the-evidence challenge, unless we find that the verdict 'is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable justice.'" ***Thames v. State***, 310 So. 3d 1163, 1174 (Miss. 2021) (quoting ***Potts v. State***, 233 So. 3d 782, 791 (Miss. 2017)).

¶19. Moore contends that the overwhelming weight of the evidence supported his version of the events that occurred and argues that the inconsistencies in Smith's testimony were so

7

great that it lacked trustworthiness. Inconsistencies and implausible accounts in a witness's testimony "might be regarded merely as a matter of witness credibility to be determined by a jury." *Ross v. State*, 954 So. 2d 968, 1017 (Miss. 2007) (citing *Hughes v. State*, 724 So. 2d 893, 896 (Miss. 1998)). However, when a witness's testimony is often inconsistent and implausible, it "weighs against its trustworthiness . . . ." *Id.* (citing *Cole v. State*, 217 Miss. 779, 65 So. 2d 262, 264-65 (1953)). In *Ross*, this Court stated that there had been "numerous and substantial inconsistencies among the testimonies" of key witnesses in the case against Ross. *Id.* at 1016. Yet this Court ultimately declined to find that the verdict was against the overwhelming weight of the evidence and held that "this Court must be wary of encroaching on the peculiar province of the jury." *Id.* at 1018.

¶20.    In *Cole*, the defendant's conviction of theft had rested on the defendant's confession and the testimony of an accomplice. *Cole*, 65 So. 2d at 262. The voluntariness of the defendant's confession was called into question; therefore, the conviction was based entirely on the testimony of the accomplice. *Id.* at 264. This Court reversed the defendant's conviction as against the "great weight of the evidence[,]" *id.* at 265, finding that "the testimony of the accomplice and the confession are so improbable, unreasonable and contradictory on this record as to be wholly insufficient for us to be able to say that the appellant's guilt was proved beyond a reasonable doubt." *Id.* at 264.

¶21.    Moore first takes issue with the contradictions in testimony regarding the initial confrontation between Smith and Moore. Smith testified that Moore had stabbed him as he

8

was getting into Chesney's truck and that he had not seen Moore until he was a few feet away. Chesney's testimony differed; he stated that Smith had gotten out of the truck to meet Moore as Moore was walking up the driveway. Moore additionally points out that Assistant Chief Kennedy had agreed that he would find a random stabbing from someone walking down the street peculiar.

¶22.   Moore also finds the surveillance video significant and argues that it showed Smith leaving the car and running over to Moore to fight. The surveillance video is very grainy and unclear. The incident also was captured from a distance and is partially distorted by the time stamp on the video. Thus, very little can be ascertained from the surveillance video. However, it is feasible that the video portrays Moore walking up Chesney's driveway and Smith taking a step or two toward him.

¶23.   Moore next contends that Smith's testimony about possessing a knife during the incident was inconsistent. The trial transcript states:

Prosecutor:   Did you have a weapon on you?

Smith:   No, sir.

Prosecutor:   You didn't have any type of weapon?

Smith:   Not that I knew of. Not at the moment, no.

Prosecutor:   You weren't trying to stab him?

Smith:   No, I wasn't. . . .

. . . .

9

Prosecutor: And you didn't have any weapons on you that day?

. . . .

Smith: No, sir. I'm sorry.

Prosecutor: And you never pulled one out even when you saw he had a knife?

Smith: No, sir.

. . . .

Defense: But, anyhow, you said that you didn't have anything—you had no weapon on you, correct?

Smith: At that moment, I didn't know, no. I'm sorry. At that moment I did not know that I had any weapon on me, no, sir. . . .

Defense: So you said—why did you tell the officer you had knives on you in your pocket?

Smith: I'm a man. Everybody's got a knife on them.

. . . .

Defense: But I'm going to ask you a question. You said you didn't have a weapon on you earlier, but now when I asked you about what you told the officer, you happen to say now you did have a knife?

Smith: I didn't say that at all. I said we are all men. We all tote knives. That's what I said.

Assistant Chief Kennedy also testified that he had found a pocketknife in Smith's pocket. And Investigator Card testified that his report indicated that during the interview at the hospital, Smith had admitted to having several knives in his pocket.

¶24. Lastly, Moore contends that Smith had lied about where he and Chesney had been

going that morning. Smith testified that he had intended to take Chesney to the doctor. Chesney testified that the two were going to get car parts. Yet Investigator Card agreed that he understood that Smith and Chesney were going to a court appearance.

¶25.    Moore claims that Smith's testimony in this case was so exceedingly implausible and unreasonable and inconsistent with the overwhelming weight of the evidence that it requires a new trial. However, even if this Court disregards Smith's testimony, the evidence is sufficient to support the verdict. This Court has held that "'inconsistencies in witnesses' testimony do not require the jury to reject the entire testimony' of a witness." ***Renfro v. State***, 118 So. 3d 560, 565 (Miss. 2013) (quoting ***Duncan v. State***, 939 So. 2d 772, 782 (Miss. 2006)). "[W]here the verdict turns on the credibility of conflicting testimony and the credibility of the witnesses, it is the jury's duty to resolve the conflict." ***Brown v. State***, 995 So. 2d 698, 702 (Miss. 2008) (internal quotation marks omitted) (quoting ***Nicholson v. State***, 523 So. 2d 68, 71 (Miss. 1998)). Moore was convicted of aggravated assault under Mississippi Code Section 97-3-7(2)(a), which provides that "[a] person is guilty of aggravated assault if he or she . . . (ii) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm . . . ." Miss. Code Ann. § 97-3-7(2)(a) (Rev. 2020).

¶26.    Moore claimed that he was acting in necessary self defense. "Self-defense has long been recognized in our law as a defense to a prosecution for assault, or as it is today known, aggravated assault." ***Anderson v. State***, 571 So. 2d 961, 963 (Miss. 1990) (citing ***Jones v.***

*State*, 418 So. 2d 832, 833 (Miss. 1982)). "In a criminal case, the burden of proof remains always with the prosecution on each element of the offense. The defendant is not required to prove he acted in self-defense, and, 'if a reasonable doubt of his guilt arises from the evidence, . . . he must be acquitted.'" *Heidel v. State*, 587 So. 2d 835, 843 (Miss. 1991) (alteration in original) (citations omitted).

¶27.  Moore himself testified that he was involved in the altercation and that he had initially crossed the street and walked to Smith in order "to fistfight" him after Smith had yelled derogatory statements. Moore additionally admitted to stabbing Smith but testified that Smith had first pulled a knife and had been trying to kill him. Chesney witnessed the altercation and testified that he saw Moore walking up and that the two men started fist-fighting and kicking when Moore pulled out a pocketknife and stabbed Smith. Chesney testified that he did not see Smith with a knife. Chesney also did not hear the two men exchange words.

¶28.  "As to a claim of self-defense, the jury is the ultimate judge of whether the defendant acted in a manner to justify self-defense." *Webster v. State*, 817 So. 2d 515, 519 (Miss. 2002) (citing *Rush v. State*, 278 So. 2d 456, 459 (Miss. 1973)). The jury heard the conflicting evidence and rejected Moore's self-defense claim. Additionally, the inconsistencies in testimony were not so great as to make the story implausible and do not equate to a verdict that is against the overwhelming weight of the evidence. Therefore, this issue lacks merit.

**II.     Whether the prosecutor properly impeached Moore with evidence of prior convictions.**

¶29.  Moore argues that the prosecutor improperly impeached Moore by using his prior

12

robbery convictions from 1987. The following exchange occurred at trial:

Prosecutor:    Mr. Moore, do you have other weapons besides the pocketknife?

Moore:    No, sir.

Prosecutor:    So you don't carry guns or whatever else?

Moore:    No, sir.

Prosecutor:    Because you've never stabbed anyone before?

Moore:    No, sir.

Prosecutor:    And you've never shot anyone?

Moore:    No, sir.

Prosecutor:    Because you're a peaceful person?

Moore:    Yes, sir, and a lot of people know it. It takes a peaceful person to do missionary work for God.

Prosecutor:    But you haven't always been a peaceful person.

Moore:    Always been a pea—I react—when people are trying to kill me for nothing, I react, yes, because I want to live. Yes, I do.

Prosecutor:    Okay. But there's a reason you don't carry a firearm, isn't there?

Moore:    What are you stating? I've been to prison before. Is that what you're stating?

Prosecutor:    Yes.

Moore:    Yes, I've been to prison before when I was younger. Yes.

Prosecutor:    For violent crimes?

Moore:    Yes, a violent crime.

13

Defense:      Your Honor —

Moore:      It was a robbing. Robbing.

Defense:      — the State made a big to-do that Mr. Smith coming after him with a weapon wasn't relative [sic] and Ms. Roughtman's testimony wasn't relative [sic], but they're making a point of his past prison time. We would say, object to relevance, Your Honor.

The prosecution and defense stated their arguments to the trial court. Over several pages of the transcript, the parties and the trial court mentioned both character evidence and impeachment, not only relevance. The court then asked if the prosecutor was finished with that line of questioning and after an affirmative response, the trial court stated, "[i]f you're moving on, we'll move on."

¶30. During Moore's sentencing hearing, it was confirmed that Moore had been convicted in 1987 of four counts of armed robbery and had served approximately six-and-a-half years.[3] Mississippi Rule of Evidence 609(b) states:

> **Limit on Using the Evidence After 10 Years.** This subdivision (b) applies if more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later. Evidence of the conviction is admissible only if:
>
> **(1)** its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and
>
> **(2)** the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use.

MRE 609(b).

---

[3]The four convictions of armed robbery had resulted from the same incident.

¶31. Moore argues that his robbery convictions more than thirty years before possessed no probative value in this case. Additionally, he argues that any probative value was substantially outweighed by its prejudicial effect. We agree that the introduction of Moore's past convictions was improper because any probative value of the convictions did not substantially outweigh the prejudicial effect. Further, Moore argues that the record includes no indication that the State gave written notice of its intent to use Moore's prior convictions; the State does not rebut this assertion. Therefore, under Rule 609(b), it was improper for the prosecution to elicit testimony about Moore's past convictions.

¶32. However, the State contends that Moore waived this argument by failing to make a contemporaneous objection in the trial court. "A specific objection on a specific ground stated to the court does not warrant on appeal a reversal of a case on another and different ground of objection." *Terry v. State*, 324 So. 3d 753, 757 (Miss. 2021) (internal quotation marks omitted) (quoting *Stringer v. State*, 279 So. 2d 156, 158 (Miss. 1973)). Counsel for Moore did not specifically object to the prosecutor's line of questioning based on Rule 609(b), but the trial court did inquire about whether the information could be used for the purposes of impeachment. Additionally, counsel for Moore did not move for a mistrial. *See Johnson v. Fargo*, 604 So. 2d 306, 311 (Miss. 1992) ("If, however, counsel still considers the party's interests 'irremediably prejudiced,' then counsel must move for a mistrial.").

¶33. Regardless of whether Moore waived the issue, any such error was harmless.[4] "Where the prejudice from an erroneous admission of evidence dims in comparison to other overwhelming evidence, this Court has refused to reverse." *Carter v. State*, 722 So. 2d 1258, 1262 (Miss. 1998) (citing *Holland v. State*, 587 So. 2d 848, 864 (Miss. 1991)). As discussed above, the jury chose to reject Moore's theory of self-defense, and the evidence was sufficient to support Moore's conviction. Therefore, the erroneous admission of Moore's past convictions did not prejudice Moore to such an extent as to require reversal. *Id.* Further, although the prosecution elicited testimony about Moore's prior convictions by asking Moore if there was a reason he did not carry a firearm, Moore voluntarily responded that he had been to prison and that he had been convicted of robberies. Accordingly, this issue has no merit.

## CONCLUSION

¶34. Because the verdict was not against the overwhelming weight of the evidence and because the admission of Moore's prior convictions was not reversible error, we affirm Moore's conviction and sentence.

¶35. **AFFIRMED.**

**KITCHENS, P.J., COLEMAN, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR. MAXWELL, J., CONCURS IN PART AND IN THE RESULT WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, C.J., AND BEAM, J.**

---

[4]The separate opinion opines that Moore clearly waived this objection. Because the trial court did address impeachment, we affirm based on the simpler, clearer basis of harmless error.

16

**MAXWELL, JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶36.    I agree Baby Boy Moore's conviction should be affirmed.  But I do not join the majority in full.  By failing to specifically object, Moore *clearly waived* his argument the State violated Mississippi Rule of Evidence 609(b) by eliciting testimony about his robbery conviction.

¶37.    "It is elementary that different grounds than the objections presented to the trial court cannot be presented for the first time on appeal." ***Russell v. State***, 607 So. 2d 1107, 1117 (Miss. 1992) (quoting ***Thornhill v. State***, 561 So. 2d 1025, 1029 (Miss. 1989), *overruled on other grounds by* ***Bush v. State***, 895 So. 2d 836, 844 n.3 (Miss. 2005))).  General objections to "relevance" or the trial court's mention of "impeachment" and "character" will not suffice, particularly when they do not cover the technicalities of Rule 609(b).  Because Moore did not specifically object based on Rule 609(b), much less mention the rule's express time and notice requirements, he has not preserved this specific question for review.  Miss. R. Evid. 103(a)(1)(B) (requiring a timely objection to preserve a claimed error in the admission of evidence).  Therefore, I concur in part and in result.

**RANDOLPH, C.J., AND BEAM, J., JOIN THIS OPINION.**