WALKER *v.* STATE.*

(Division A.   Oct. 12, 1925.)

[105 So.   497.   No. 25151.]

1. HOMICIDE.  *No evidence of manslaughter.*
   Evidence *held* to present no element of manslaughter so as to require instruction defining it.

2. HOMICIDE.  *Threat by deceased against another inadmissible.*
   Previous threat by deceased against another than defendant *held* inadmissible.

3. HOMICIDE.　*Corpus ·delicti established by mutilated body.*
　*Corpus delicti held* sufficiently established by dead body found in
　road, with whole over eye, throat cut, and several cuts in neck.

4. HOMICIDE.　*Evidence of murder held sufficient.*
　Evidence *held* sufficient to sustain conviction of murder.

　　*Headnotes 1. Homicide, 30 C. J., Section 659; 2. Homicide, 30 C. J.,
Section 420; 3. Homicide, 30 C. J., Section 529; 4. Homicide, 30 C. J.,
Section 557.

　APPEAL from circuit court of Amite county.
　HON. R. L. CORBAN, Judge.
　Isom Walker was convicted of murder, and he appeals.
Affirmed.

　*J. S. McGuire,* for appellant.

　It is the contention of appellant that the court erred
in refusing to grant the motion to exclude the evidence
of the state and direct a verdict for the defendant, and
also the refusal to grant a peremptory instruction, for
the reason that the state absolutely failed to make out
a case of murder against the defendant beyond a reason-
able doubt.

　There is nothing in the evidence with which to con-
tradict the testimony and theory of self-defense as
pleaded by the defendant. In fact, the statement to the
deputy made by the defendant when arrested, to search
the body of the deceased Isaacs and that he would find
thereon a pistol, bears out the theory presented by him.

　There are no circumstances contradicting his admis-
sion and the only evidence to connect the defendant with
the killing is his own statement that he acted in self-
defense after being assaulted by the deceased. We are
supported in our contention by rulings of the previous
decisions of this court as follows: *Houston* v. *State,* 78
So. 182; *Cumberland* v. *State,* 70 So. 595.

　It is further argued by the appellant that under the
statement of facts and circumstances as adduced in this

case, a manslaughter verdict should have been the extreme penalty allowed by the trial court. *Williams* v. *State,* 90 So. 705; *Williams* v. *State,* 98 So. 242.

Appellant seriously contends that the court erred and committed reversible error by refusing to grant the instruction asked for by the defendant in part 3 of the assignment of error and contends that the instruction referred to should have been granted. See, *Stringfellow* v. *State,* 59 Am. Dec. 247; *Sam* v. *State,* 33 Miss. 347; *Pitts* v. *State,* 43 Miss. 472; *Jenkins* v. *State,* 41 Miss. 582; *Heard* v. *State,* 59 Miss. 547.

Appellant contends that it was a reversible error to allow witness Bales to testify as to the admission of the defendant when it was not clearly shown under what circumstances the said admission was made. We seriously contend that the admission and statement were not made freely and voluntarily and should not have been admitted under the circumstances.

Appellant contends that the threats as made by the deceased Isaacs to Jesse Caston and the conversation showing the cause of said threats should have been admitted. *Blalock* v. *State,* 31 So. 105; *Johnson* v. *State,* 65 So. 218.

Especially do we contend that the evidence of Jesse Caston should have been admitted as it would tend to show who was the aggressor in the case in question. *Blalock* v. *State,* 31 So. 105.

*F. S. Harmon,* Assistant Attorney-General, for the state.

This appellant went to the house of a Mr. Wilson the morning of the homicide and told this gentleman to phone the sheriff that a dead man was lying in the road about two or three hundred yards from his, the appellant's home. Witness Bales, responding to this phone call, found the deceased lying in the road with a bruise and cut over his eye and four or five cuts made with an

ax on his neck. These cuts on the neck had well nigh severed the head from the body.

Mr. Wilson and his wife also telephoned E. L. Barron, a justice of the peace, and Mr. Barron came by the appellant's home and the appellant told him that when the sheriff got there for them to come and get him. After Deputy Sheriff Hazlewood arrived Messrs. Barron and Hazlewood arrested the appellant and he made a statement as to how the homicide occurred.

The case for the state rests entirely on the statement which these officers say this appellant made to them at that time. The appellant took the stand in his own defense, and insisted that he acted in self-defense. The fundamental question in this case is whether or not the state has proved the *corpus delicti aliunde* the statements of the accused. The latest case on this point is *Floyd* v. *State*, 103 So. 367. This case is also much like *Houston* v. *State*, 78 So. (1918) 182.

The record is short and we believe that no good purpose would be served by rehashing the variation between the testimony of the officers as to what this appellant said to them and the appellant's testimony on the stand. Boiled down to its last analysis, the state's case hinges on statements made by the appellant and the important question is the sufficiency of this testimony to sustain the conviction.

There is no merit in appellant's contention that the testimony of Jesse Caston was improperly excluded. This witness was permitted to testify to the fact that trouble existed between the appellant and deceased, but he stated that when he had attempted to settle this trouble in an interview with the deceased, he did not hear the deceased threaten this appellant, but that the deceased threatened him, the witness. The objection to the introduction of this threat was quite properly sustained, tho it is indicated quite clearly that if this witness had stated that he had heard the deceased threaten the

life of the appellant such testimony would have been admitted.

In the light of the cases cited and the evidence in this case, we respectfully submit this case.

McGOWEN, J., delivered the opinion of the court.

Defendant, Isom Walker, appellant here, was convicted of murder and sentenced to the penitentiary for life. We quote the following facts: On the morning of the homicide, the defendant went to the home of Mr. Wilson and requested that he telephone the sheriff that a dead man was lying in the road about two hundred or three hundred yards from appellant's home. The witness Bales responded to this call, and to this witness the defendant made the following statement:

" 'When I met him I didn't give him any show at all.' He pointed to a tree down the road; he says, 'He begin to reach like he was reaching for a gun, and I went right on down the road meeting him, and didn't give him any show at all,' and then he showed me where he cleaned the blood off his ax on the ground."

Precisely the same statement was made to another witness, and the sheriff and the officers found the dead body of Josephus Isaacs lying in the road with his head down hill, practically severed from his body, with five or six cuts on his neck. The defendant moved to exclude the testimony of these witnesses, which was overruled by the court. Thereupon he was sworn as a witness, and gave his account of the homicide, which is as follows:

"When he got pretty close to me, he throwed his hands up like that [showing], like he was going to throw his hand in his bosom to get a gun—I didn't see no gun, but it looked like he was kind of unbuttoning his shirt. I don't know what he was going to do, but he put his hand in his bosom, and, after he done that and was coming on toward me, he taken his hand out of his bosom, and then he says, 'You God damn black son of a bitch, I have got

your wife, and that's not all, I have got her and you can't help yourself.' He says, 'I can mighty near have any negro's wife in this neighborhood with my money,' and it looked to me like he was going after a gun. I don't know whether he had a gun or not, but as he went in his bosom the second time I thought he was going after his gun again, and as he got near me he taken it out and put it in his pocket and says, 'You son of a bitch and a few white ones says I got your wife and can get most any negro's wife in this neighborhood and a few white ones,' and about that time, I had my ax under my arm—

"Q. How did you have your ax? A. I had it under my arm in this manner.

"Q. Was it cold that morning? A. Yes, sir. About the time he got at me he looked like he was coming on me, and he first put his hand up here, and when I got in a few steps of him, I was on this side of the road, and I understood the law is to always give a man his side of the road; we had met before, and we would always say 'Good morning' or 'Good evening,' but this time he was near the middle of the road and as he got nearer to me, the closer he got to my side of the road. I couldn't say he had a gun and wouldn't, but about the time he got pretty close to me I thought about my ax, and I grabbed my ax from under my arm. I don't remember positively how I hit him with it, but I hit him a lick like this, and as I hit him he was near my side of the road and then he made a rush to come on me. I was afraid he had a gun, and I knowed that he had showed me his gun before at his house, and I had seen in front of his house where he had shot a cedar. You understand I didn't know what he had, and for fear he did have one when he got near enough to me, you understand, I made a jump and got my ax. I don't know whether I hit this way with the ax or over this ways; any way I hit him with the ax, and it knocked him down,

but he was coming right on me, and as I struck him it knocked him back on his side of the road, and, after he fell. I don't know just how I hit him, but I hit him something like this, but whether I hit him any more than two or three licks I don't know. You understand I was so scared this man was going to get hold of me until I didn't know what to do, and of course you understand I knocked him off, and all I can tell you after that I was scared, and I was afraid he was going to get up, and I knowed if he got up, and knowing he was a bigger man than me and as good a man as me, and, you understand, I hit him two or three licks, and after I seen he wasn't going to get up, I went over to the other side of the road and wiped my ax off, and went on back to my house, and left my ax and went on over to Mr. Poley Wilson and got his wife to telephone for the sheriff.''

From this statement the defense interposed by the defendant on the witness stand to this most horrible and brutal killing is that he was afraid of the deceased. It will be noted that at the time he struck the blow the appellant does not contend that the deceased was doing anything with his hand, and that he continued after he had knocked him down with an ax to chop the deceased's neck. The most that can be said in defendant's favor is that under his own statement of the facts upon the witness stand he was guilty of murder or acted in self-defense. Although in the general instruction the court charged the jury that defendant might be convicted of manslaughter, we find no element of manslaughter in this case; hence it was not error for the court to refuse instructions defining manslaughter. Likewise there was no error in the court's refusal to permit Jesse Caston to testify as to a threat made by the deceased against him (Caston).

We think the dead body of Josephus Isaacs, found lying in the road by the officers, with a hole over the right eye, with his throat cut and bruised, throat bone

cut in two, and with five or six cuts in the neck, sufficiently establishes the *corpus delicti*.

The jury took the view that this was a case of murder, and we see no reason for disturbing their finding.

*Affirmed.*