STATE, RESPONDENT, v. HEASTON, APPELLANT.

(No. 7,968.)

(Submitted October 3, 1939. Decided November 15, 1939.)

[97 Pac. (2d) 330.]

304

*Mr. James E. Kelly* and *Mr. Serenes T. Schreiber,* of Boise, Idaho, for Appellant, submitted a brief and argued the cause orally.

*Mr. Harrison J. Freebourn,* Attorney General, *Mr. Carl N. Thompson,* Assistant Attorney General, and *Mr. Leonard A. Schulz,* County Attorney of Beaverhead County, submitted a brief; *Mr. Schulz* and *Mr. T. E. Gilbert,* of counsel, argued the cause orally.

MR. JUSTICE ERICKSON delivered the opinion of the court.

The defendant was convicted by a jury in the district court of Beaverhead county in the fifth judicial district of first degree murder. This is an appeal from the judgment, and from the order denying defendant's motion for a new trial.

On July 24, 1939, the defendant was living in a certain dwelling house at Wise River, Beaverhead county, Montana. On that day Joseph Potts came to visit at the residence of his daughter, Mrs. Martin, in Wise River. The Heaston residence and Martin residence were some sixty feet apart. Potts claimed title to the old townsite of Wise River and also claimed ownership of the dwelling on the townsite in which defendant resided. There had been some difficulty between the two over defendant's continued possession of the house. Ingress to the property on which the dwelling stood was gained through a gate which

ordinarily was padlocked, with the key being hidden under a certain rock known to all those who commonly used the gate. On the day in question Potts removed the key from under the rock and had it in his 'possession while Potts was at the Martin residence that day. During the course of the conversation which ensued between defendant's son, William Heaston, Jr., who came to the Martin home and Potts, and asked to see the deceased, and which took place just outside the Martin residence, some reference was made to the gate and key. The testimony is that the conversation between them was friendly up to the moment the gate and key were mentioned. Except for the first part of the conversation no one overheard what was said by them, except for certain scraps of the conversation testified to by various witnesses.

The witness Mrs. Mary Heaston testified that Potts struck Heaston, Jr., in the face and then said: "I will kill you, you son of a bitch. I will do it right now." The defendant and other witnesses for the defense testified to this same statement. A fight ensued. Mary Heaston testified with Heaston, Jr., that Potts during the course of the fight succeeded in getting his arm around Heaston, Jr.'s, throat and succeeded in partially choking him, but defendant did not testify to seeing this. With the exception of that testimony, however, all of it indicates that the two were evenly matched and that it was a fair fight. At the moment of the fatal shooting, the witnesses Mr. and Mrs. Martin, daughter and son-in-law of Potts, testified that Heaston, Jr., had knocked Potts to the ground and that he was in the act of rising when the shots were fired. The testimony of the doctors who performed the autopsy indicates that the course of the bullets in the body was such that Potts was not in a standing position with his body erect. In order for the bullets to take the course they did, it was necessary that Potts be in an extremely stooped position.

The witnesses for the defense, though denying that Potts was getting up after being knocked down, testified that at the moment the shots were fired there had been and was a pause in the fight and that Potts was in a stooped-over position.

The record shows that at the time the fight started the defendant was at the door of his residence, and that he saw the fight start; that he went into his own house and secured a loaded revolver from the wall; that he walked to a point within a few feet of the combatants, and without warning fired three shots at Potts and then returned to his house, and that Potts died as a result of the shooting.

The theory upon which defendant based his defense was that, when he saw Potts and his son engaged in the fight and heard Potts threaten to kill his son, he feared his son's life was in danger and that he thought in order to protect his son it was necessary for him to take the life of Potts; in other words, that the homicide was a justifiable one under the theory that he was acting in the defense of his son's life.

There are many assignments of error, some of which will require an additional statement of facts, and this will be given in the discussion of the particular assignment.

Error is predicated upon the insufficiency of the information, ▇▇▇ the charging part of which reads: "The said William J. Heaston, on or about the 24th day of July A. D. 1938, at the County of Beaverhead, State of Montana, did then and there wilfully, unlawfully, feloniously, deliberately, premeditatedly, and of his deliberate, premeditated malice aforethought kill and murder one Joseph W. Potts, a human being," etc. It is the contention of the defendant that the allegation of time in the information is not sufficient.

Section 11848, Revised Codes, provides: "The precise time at which the offense was committed need not be stated in the indictment or information, but it may be alleged to have been committed at any time before finding or filing thereof, except where the time is a material ingredient in the offense." It is not here claimed that time was a material ingredient of the offense charged. The date alleged in the information was prior to the date of its filing and, since time was not an essential ingredient of the offense, the statement as to time is sufficient. For an exhaustive discussion of this subject see *State* v. *Thompson*, 10 Mont. 549, 27 Pac. 349; also *State* v. *Vanella*, 40 Mont.

326, 106 Pac. 364, 20 Ann. Cas. 398; *State* v. *Terry*, 77 Mont. 297, 250 Pac. 612; 31 C. J. 682.

Counsel further urges that the information is faulty in that it does not state the means or the manner by which the offense was committed. This court has passed on that a number of times, and we do not propose to go into it at length again. The information need not state the means by which the crime was committed. (*State* v. *Hayes*, 38 Mont. 219, 99 Pac. 434; *State* v. *Nielson*, 38 Mont. 451, 100 Pac. 229; *State* v. *Guerin*, 51 Mont. 250, 152 Pac. 747.)

Error is predicated in specification No. 2 on the delay of the court in pronouncing judgment—particularly it is based on the fact that the judgment was not pronounced in the same term of court during which the trial was had and the verdict rendered. In order to dispose of this assignment it is necessary to examine the record to determine what transpired between the date the verdict was rendered and the date the judgment was pronounced.

On November 18, 1938, the jury returned its verdict finding the defendant guilty of murder in the first degree, and fixing punishment at life imprisonment. At the defendant's request time for pronouncing sentence was set for the same day. At the hour so fixed defendant asked that the time for passing sentence be delayed thirty days. The court denied this request, and time for pronouncing judgment was reset at November 19, 1938. At that time defendant appeared and presented a motion in arrest of judgment. At the presentation of this motion the court deferred pronouncement of judgment until the motion in arrest was disposed of. This motion was set for hearing on November 25. After that hearing the court granted to the state time for filing briefs, and on November 29, 1938, the motion was denied. The defendant then presented a motion for new trial, and it was set for hearing on December 16, 1938. A hearing on the motion was had, and on that hearing the state was given ten days in which to file briefs, and the motion was taken under advisement. On January 19, 1939, the motion was denied, defendant then being in court personally

and with counsel. Defendant was asked if he had any legal cause why judgment should not be pronounced forthwith, to which he replied he had none. Judgment was then on the same day pronounced.

Ordinarily, the court must pass judgment without delay, other than that provided in section 12055, Revised Codes, which declares: "After a plea or verdict of guilty, or after a verdict against the defendant on the plea of a former conviction or acquittal, if the judgment be not arrested or a new trial granted, the court must appoint a time for pronouncing judgment, which, in cases of felony, must be at least two days after the verdict, if the court intend to remain in session so long; but if not, then at as remote a time as can reasonably be allowed."

Section 12066 provides: "If no sufficient cause is alleged or appears to the court why judgment should not be pronounced, it must thereupon be rendered."

Here there were various motions presented to the court by defendant which properly should be disposed of before the judgment be pronounced. Many cases are cited by counsel to the effect that delay in the pronouncement of judgment is error. In those cases there were no intervening motions, and in each case cited the court was careful to except the situation presented here by defendant's motions. Typical of the cases cited is that of *People ex rel. Smith* v. *Allen,* 155 Ill. 61, 39 N. E. 568, 569, 41 L. R. A. 473, where the court quotes with approval from Colby on Criminal Law, 390, 392, as follows: " 'No court has authority to suspend sentence indefinitely against criminals who have been found guilty by a jury, or have pleaded guilty. A suspension of sentence or stay is not authorized except upon * * * an application in arrest of judgment or for a new trial.' " This case is squarely within the exception stated.

What is said in *People* v. *Vaughn,* 25 Cal. App. 736, 147 Pac. 116, at page 117, is also applicable to the facts here, where the delay in pronouncing judgment was occasioned by defendant's own motions and without his objection. It is there said: "The postponement of the pronouncing of judgment was had

at the request of the defendant. That being so, the point cannot be availed of upon this appeal."

It is urged under this specification that sentence could not be legally pronounced at a later term of court. The Oklahoma court was faced with the same argument under identical statutory provisions, in *Ex parte Sparks*, 9 Okl. Cr. 665, 132 Pac. 1118, and said: "It is seen that there is nothing in these sections forbidding pronouncing a judgment at a term subsequent to that on which the verdict was rendered against a defendant. Under section 5953 [22 Okl. St. Ann. § 972], the court for sufficient cause is expressly authorized to postpone judgment to such time as the court in its discretion may think proper. The law evidently contemplates that ordinarily the judgment should be pronounced at the same term of the court at which the verdict is received, and this should be done unless there is a real necessity for a postponement of the judgment until a subsequent term of the court, which necessity should appear as a matter of record as it does in this case. Conditions may arise which would render it impossible to render judgment at the same term that a verdict is returned. Suppose a defendant after the verdict has been returned against him escapes from custody, and is not captured until after the term of the court at which he was convicted has expired; who would say that judgment could not be pronounced against him as soon as he could be brought before the court? Many other illustrations might be stated, among which are the circumstances of this case, but these are sufficient to illustrate the principle involved."

We can find no command in our statutes that sentence be pronounced at the same term the verdict is returned or the plea of guilty entered.

It is true that under the common law the power of the court in any particular matter was limited to acts performed by the court within the term in which the matter was heard. Our sections 8826 and 8827, Revised Codes, are the sections of the Code dealing with terms. In the first of these sections it is expressly provided that there shall be no terms in those judicial districts in which there is but one county. "The district

court of each county which is a judicial district by itself has no terms, must be always open for the transaction of business, except on legal holidays and non-judicial days, and must hold its sessions at the county seat.'' The same section provides that in districts where there are two or more counties, terms of court in each county must be fixed and there must be at least four terms in each year. Section 8827 provides that adjournments of the court during the term shall be considered as recesses and shall not prevent the court from sitting at any time. In reading these sections together, it is apparent that the legislature in providing for terms in the districts of more than one county was primarily concerned with an administrative problem and had in mind, in providing for terms in the various counties, that a definite time be fixed for the terms to apprise litigants of the times in which appearances could be made before the court. It would be a peculiar rule that would permit the rendition of judgment at any reasonable time in Silver Bow county in a district in which terms have been abolished, and at the same time provide that judgment could not be pronounced in Beaverhead county except during the particular time fixed by the court as a term.

We believe that the rule announced in the *Sparks Case*, supra, in light of our statutory provisions, is a reasonable one—particularly in view of the fact that nowhere in the statutes does any command appear that sentence be pronounced at the same term.

The various motions presented to the court a situation wherein it was required to exercise its discretion under section 12066, Revised Codes. The motions made, which the court properly could dispose of before pronouncing judgment, presented sufficient legal cause for deferring the pronouncement of judgment, and so long as such cause existed the court properly postponed sentence until those motions were disposed of, which was not until the next term of court. (See *People* v. *Felix*, 45 Cal. 163; *In re Flint*, 25 Utah, 338, 71 Pac. 531, 95 Am. St. Rep. 853; 16 C. J. 1277.)

Error is predicated upon the refusal of the court to allow ▮ certain offered testimony. To support the theory of justifiable homicide the defendant testified, in addition to what he said concerning the fight and the threats there made by Potts, that on many occasions he had seen Potts carrying a revolver; that Potts had the reputation in the community for being a violent, quarrelsome and high-tempered man; that he had heard Potts threaten other people and that he had heard of other threats which Potts had made against third persons. The defense then called various witnesses to testify in detail as to these various threats. The court permitted the witnesses to testify that they had told defendant of them and that Potts had actually threatened persons as related by the witnesses to the defendant, but the court did not permit them to testify in detail as to what actually transpired when the threats were made. Counsel cites many cases in support of their theory that details of these threats are admissible. Counsel failed to distinguish the facts in this case from the facts in the cases and authorities cited.

In the cases and authorities relied upon the threats were directed against the defendant himself. None of the threats here purport to have been against the defendant or his son. Ordinarily, then, they were inadmissible. "Under claim of self-defense * * * threats to be admissible, must apply to defendant individually [or here, his son], or to him as a member of a class." (Underhill's Crim. Ev., 4th ed., sec. 564.)

Referring to the rule allowing admission of testimony as to threats, the Kentucky court said: "That rule, however, is qualified, or, rather, the character of threats may be distinguished where * * * they do not disclose a state of mind antagonistic to accused specifically or are not applicable to him as one of a class or group." (*Commonwealth* v. *Girkey,* 240 Ky. 382, 42 S. W. (2d) 513, 514. See, also, *Walker* v. *State,* 140 Miss. 238, 105 So. 497; *Jenkins* v. *State,* 80 Md. 72, 30 Atl. 566; *Young* v. *State,* 150 Miss. 787, 117 So. 119; Wigmore on Evidence, sec. 247; 30 C. J. 66, 239.) In all of the Montana cases cited, the threats were against the defendant himself or against

the one defendant alleged he was protecting. (*State* v. *Hanlon,* 38 Mont. 557, 100 Pac. 1035; *State* v. *Felker,* 27 Mont. 451, 71 Pac. 668; *State* v. *Jones,* 48 Mont. 505, 139 Pac. 441; and see *State* v. *Whitworth,* 47 Mont. 424, 133 Pac. 364, where defendant was one of a class threatened.)

In the Montana cases the threats against defendant were admitted to show the mental condition of the deceased toward the accused, where there was doubt as to who was the aggressor. No such question is presented here, as the uncontradicted testimony is that Potts struck the first blow. The testimony of the witnesses for the state and for the defendant agrees on the point that there was a pause in the fight at the time the shooting occurred. Witnesses for the state testified that Potts was just getting up from the ground after being knocked down by Heaston, Jr.; while the defense witnesses stated that the combatants were several feet apart and Potts was in a very stooped position, and that both were pretty well out of wind, and the fight was stopped momentarily. Under either version it is apparent that neither was the aggressor at the moment the defendant appeared on the scene and started shooting.

The threats then could only serve to show Potts' character, and that defendant knew of his reputation. He was allowed to testify fully in the usual way as to this. He was permitted also to testify that deceased usually carried a gun, and others were also allowed to testify fully on these matters. Great latitude was allowed the defendant in testifying on all of these points to show his frame of mind, even extending to allowing testimony as to these third-party threats. It is to be noted that no proof or offer of proof was made to show that deceased had actually assaulted anyone, and all offers of proof only went to prove that he had on a number of occasions threatened to assault someone not the defendant or his son. No error was committed by the lower court in excluding the testimony covered by the assignments.

Specification of error No. 4 is not well taken. Defendant ▪ argues that since the sheriff was a witness for the state, and that the deceased was a deputy sheriff, it was error to allow

the sheriff, or any of his deputies to summon the jury under the theory that they were interested in the outcome of the case. There was no showing to disqualify the sheriff, but, if there were, defendant could only object to the panel in the manner prescribed by the statute, i. e., by a challenge to the panel before the jurors were sworn. (Sec. 11946, Rev. Codes.) Defendant does not claim nor show that he did not know at the time of the examination of the jurors how they were summoned.

Specifications of error Nos. 20 to 35 cover asserted error in ▉ refusing to give certain instructions and in not giving others. The state cites section 11969, Revised Codes, as authority for its argument that we cannot consider the specifications covering the refusal of the court to give certain proffered instructions, for the reason that the defense did not specify in its objections to the ruling of the court the error of the court in refusing to give such proffered instructions. Under the decision in *State* v. *Daw*, 99 Mont. 232, 43 Pac. (2d) 240, instructions refused do not come within the provisions of section 11969, requiring specific objection and a statement of wherein the court erred in refusing the instructions offered.

The meat of defendant's argument in the specifications is that the general tenor of the instructions given was prejudicial to the defendant, and the defendant's theory of the case was not properly presented by the instructions. He does not claim that the instructions given did not in substance state the law.

It is unnecessary to discuss each proffered instruction, and each ▉ instruction given, separately or in detail. We have examined with great and painstaking care all of the instructions, both those refused and those given, and are struck with the care used by the lower court in adequately presenting to the jury the law of the case, both as to the crime itself and as to the theory of justifiable homicide advanced by the defendant. The instructions are in the language of the statute, and they have been examined by this court with approval many times. It is true that the proposed instructions in the main correctly state the law, as is true, for example of a typical proposed in-

struction, No. 1; but where the matter is covered by a given instruction, in this case by Instruction No. 41, it is not error to refuse defendant's request. (*State* v. *Mahoney*, 24 Mont. 281, 61 Pac. 647; *State* v. *Berberick*, 38 Mont. 423, 100 Pac. 209, 16 Ann. Cas. 1077; *State* v. *Huffman*, 89 Mont. 194, 296 Pac. (2d) 789; *State* v. *Dotson*, 26 Mont. 305, 67 Pac. 938.)

The theory of justifiable homicide was explained to the jury in Instruction No. 37 and others, and it was made clear to the jury that the rules applicable to self-defense applied where the defendant reasonably thought he was protecting the life of his son. Defendant argues that too much emphasis was placed in the instructions upon a definition of the elements of the crime of murder. The defendant here was tried for first degree murder, and certainly complete and full instructions on malice, premeditation and wilfulness and on the other elements of the crime were indispensable. We find no error in the refusal of the court to give the instructions refused, since the substance of all of them was adequately covered in instructions given. Nor do we find any error in the instructions objected to.

Further error is specified on the scope allowed the state in the re-examination of the witness Charles Lloyd. The witness was called by the state to testify as to the reputations of the defendant and Heaston, Jr., in the community for truth, honesty and integrity, and also as to their reputations for being quarrelsome and violent. After testifying that their reputations on these characteristics were bad, the witness was cross-examined by the defendant. On the cross-examination the witness was asked, for the purpose of showing bias and prejudice, if it were not true that on two specific occasions, while the witness and the Heastons were working in a certain mine, there had been friction and difficulty. The witness testified that there had been. When the cross-examination was completed, the witness on re-examination was permitted to testify that on these two specific occasions there had been altercations, and he was allowed to testify in some detail as to these matters.

In the situation where the matter testified to is brought out

on cross-examination for the first time, the new matters presented make sections 10665 and 10667, Revised Codes, applicable. Section 10665 reads: "The opposite party may cross-examine the witness as to any facts stated in his direct examination or connected therewith, and in so doing may put leading questions, but if he examine him as to other matters, such examination is to be subject to the same rules as a direct examination." And section 10667 provides in part: "A witness once examined cannot be re-examined as to the same matter without leave of the court, but he may be re-examined as to any new matter upon which he has been examined by the adverse party."

The court could properly within its discretion permit the witness to testify as to the specific instances first brought out on cross-examination to remove, if possible, the impression created that those instances created bias and prejudice on his part, and the court did not abuse its discretion in permitting such testimony. The record shows that the court carefully limited the testimony on re-examination and did not permit the witness to testify on collateral, immaterial, independent and irrelevant matters, and only allowed him to testify as to matters which would indicate his attitude toward the defendant and the defendant's son.

Upon re-examination, then, under the above sections the rules as to cross-examination apply, and the court, as in the case of ordinary cross-examination, has a wide discretion in determining the scope and extent of re-examination as to the new matters brought out on cross-examination. (*State* v. *Byrd,* 41 Mont. 585, 111 Pac. 407; *State* v. *Sedlacek,* 74 Mont. 201, 239 Pac. 1002; *McGonigle* v. *Prudential Ins. Co. of America,* 100 Mont. 203, 46 Pac. (2d) 687.) As in the case of cross-examination, a wide latitude should be extended in the re-examination as to new matters. (*State* v. *Pippi,* 59 Mont. 116, 195 Pac. 556; *Moss* v. *Goodhart,* 47 Mont. 257, 131 Pac. 1071; *Miles Savings Bank* v. *Liquin & Swandal,* 90 Mont. 513, 4 Pac. (2d) 482.)

The lower court was apparently guided by the rule pronounced in *Croft* v. *Thurston,* 84 Mont. 510, 276 Pac. 950, 952, wherein

this court said: "We recognize the rule that, where one party cross-examines a witness as to a transaction, the witness may be re-examined for the purpose of bringing out such further portions of the transaction as tend to explain the portion already in evidence. (Jones' Commentaries on Evidence, 2d ed., sec. 2460.)"

The judgment and order appealed from are affirmed.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES MORRIS, ANGSTMAN and ARNOLD concur.

Rehearing denied January 5, 1940.