607 So.2d 1107 (1992)
Willie RUSSELL
v.
STATE of Mississippi.
No. 90-DP-1141.
Supreme Court of Mississippi.
August 12, 1992.
*1109 W.S. Stuckey, Jr., Whitman D. Mounger, Greenwood, for appellant.
Michael C. Moore, Atty. Gen., Marvin L. White, Jr., Asst. Atty. Gen., Charlene R. Pierce, Sp. Asst. Atty. Gen., Jackson, for appellee.
EN BANC.
DAN M. LEE, Presiding Justice, for the Court:
On July 18, 1989, Parchman inmate Willie Russell stabbed Correction Officer Argentra Cotton, who subsequently died from the wounds. Russell was indicted as an habitual offender for the capital crime of killing a peace officer acting in his official capacity as a Correctional Officer of the Mississippi State Penitentiary in violation of Miss. Code Ann. § 97-3-19(2)(a) (1972). On October 4, 1990, following a jury trial in which Russell testified in his own behalf as the only defense witness, Russell was found guilty of capital murder. On October 5, 1990, the jury sentenced Russell to death. We affirm as to the guilt phase and the conviction of murder. However, feeling bound by prior decisions of this Court as well as the United States Supreme Court, we vacate the sentence of death and remand for further proceedings.

FACTUAL BACKGROUND
On July 18, 1989, 6' 7", 247 pound Willie Russell was lawfully incarcerated in Parchman, housed in maximum security Unit 24-B, cell 46, located on the upper level near the stairs in Zone 3. Russell was in "C" custody status: close confinement. Corrections Officer Argentra Cotton  approximately 5' 10" or 6', 180 pounds  worked the 4:00 p.m. to 12:00 midnight third watch for 24-B on July 18, 1989; his partner was Officer Calvin Lee. The duties for the third watch were to shower, feed and, where necessary, medicate the inmates.
The food trays for the evening meal arrived after showering had been completed. Officer Lee stayed in the control tower to complete the shower log while Officer Cotton, with the help of designated inmates, began to distribute the trays to the inmates. While trays for half of the unit were being distributed without incident, Russell removed the 16" by 10" bottom air vent in his cell door, crawled through the space, and managed to secrete himself behind the stairwell pillar on the lower level of the unit. Russell was armed with a homemade knife known as a "shank."
At approximately 6:50 p.m., Officer Cotton and his inmate assistant entered the lower level of Zone 3 with the food trays. Officer Cotton was in the process of locking the door between Zones 2 and 3, unarmed and with his back turned towards Zone 3, when he was rushed from behind by Russell, who proceeded to stab him with the "shank." Officer Cotton turned, dropped his keys, and attempted to protect himself by fighting off Russell with a plastic food tray.
Officer Cotton backed up the stairwell swinging a plastic food tray back and forth in front of him for protection. Russell pursued Officer Cotton up the stairs, stabbed him in the back and, upon reaching the upper level, held Officer Cotton on the floor with his knee as he continued to stab him. At this point, Officer Lee drew Russell's attention away from Officer Cotton for a sufficient amount of time to allow Officer Cotton to successfully retreat into the guard control tower; Officer Lee followed, leaving Russell, covered with blood and still in possession of the "shank," standing on the stairs staring into the control tower.
*1110 Officer Cotton called for help and within minutes, assistance arrived. Upon arrival, none of the officers realized Officer Cotton was injured. An officer entered Zone 3, asked for, and received, the "shank" from Russell. Russell was then placed in restraints.
Officer Cotton had two major visible wounds each between 1 1/2" and 1 1/2" in length  a stab wound along the left collar bone and another stab wound on the right chest directly below the right nipple; he had two minor wounds to the back. Officer Cotton was taken by ambulance to the Parchman emergency room and subsequently transferred to the Bolivar County Hospital where he expired as a result of internal hemorrhage.

GUILT PHASE

I.

Whether the lower court erred in overruling defendant's Motion for Individualized Sequestered Voir Dire after the Court's and Counsel's general voir dire in violation of the Sixth, Eight, and Fourteenth Amendments to the United States Constitution and Mississippi Code Annotated, Section 13-5-69 (1972).
Russell moved for individualized sequestered voir dire of all prospective jurors. His motion was denied; however, voir dire of panels of no more than 12 was granted.
The procedure for conducting voir dire in criminal cases is governed by Rule 5.02 of the Uniform Criminal Rules of Circuit Court Practice which provides, in part, that "[i]ndividual jurors may be examined only when proper to inquire as to answers given or for other good cause allowed by the court." Under this rule, "voir dire examination of jurors shall be directed to the entire venire with questions addressed to individual members only upon good cause and so as to inquire into juror answers. This practice has been upheld by our case law." Billiot v. State, 454 So.2d 445, 456 (Miss. 1984). This Court recently addressed this subject in Hansen v. State, 592 So.2d 114, 126 (Miss. 1991): We do not read Rule 5.02 as prohibiting a circuit court from utilizing individualized, sequestered voir dire. In its discretion, the court may allow it. Jones v. State, 461 So.2d 686, 692 (Miss. 1984). We have held, however, that Rule 5.02 does not require more than by its terms it requires. White v. State, 532 So.2d 1207, 1218 (Miss. 1988); Lutes v. State, 517 So.2d 541, 547 (Miss. 1987); West v. State, 463 So.2d 1048, 1054 (Miss. 1985); see Gilliard v. State, 462 So.2d 710, 714 (Miss. 1985).
Russell was afforded individual voir dire, but not sequestered individual voir dire. As Russell correctly notes, his "contention that he should have been allowed to individually voir dire jurors out of the presence of the others is not supported by the decisions of this Court." White v. State, 532 So.2d 1207, 1218 (Miss. 1988). Accordingly, the trial court acted within its discretion in denying Russell's motion for sequestered individual voir dire. This assignment is without merit.

II.

Whether the lower court erred in failing to declare a mistrial based upon the State's abuse of its peremptory challenges to exclude blacks from Russell's jury thereby depriving Russell of his right to a representative jury and to due process of law.
Russell, a black man, was tried by a jury consisting of nine whites, two blacks, and one Oriental. In selecting the jury, the State used 11 of its challenges: 9 challenges against blacks, 2 challenges against whites; the defense used 10 of its challenges: 9 against whites and 1 against a black. Russell challenged the State's use of nine peremptory challenges against members of the black race, alleging its challenges constituted an impermissible practice under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The State articulated reasons for all its challenges. The trial court found the State's reasons to be racially neutral and overruled the Batson Motion.
In examining this assignment of error

*1111 [w]e give "great deference" to the trial court's findings of fact on this issue. [citation omitted]. As long as the trial court was within its authority when it determined that the State articulated a "neutral, non-race based explanation," we will not reverse. [citation omitted].
Willie v. State, 585 So.2d 660, 672 (Miss. 1991). We have carefully examined each of the reasons given by the State and find that the trial court was within its authority in declaring each reason to be racially neutral. This assignment is without merit.

III.

Whether the "death qualification" of the jury denied Russell an impartial jury from a cross-section of the community or asked for a promise of a particular verdict to be returned.
The State's core voir dire questions followed the same pattern with each panel: Do you favor capital punishment or are you opposed to it? Even though you don't favor capital punishment, could you weigh the aggravated circumstances against the mitigating circumstances? If you found the aggravated circumstances outweighed the mitigating circumstances could you vote to impose the death sentence? Would you look for a lesser crime to find him guilty of or not guilty, even though the State proved him guilty of capital murder, in order not to have to face the question of death sentence?
Russell has worded this issue and framed this argument to address questions presented to the jury panel as a whole. However, Russell only directs this Court's attention to specific State voir dire questions asked of two prospective jurors, only one of whom was dismissed for cause.
The United States Supreme Court "clarified the standard for determining whether prospective jurors may be excluded for cause based on their views on capital punishment," otherwise known as the Witherspoon rule, in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985):
[The proper standard] is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." We note that, in addition to dispensing with Witherspoon's reference to "automatic" decision making, this standard likewise does not require that a juror's bias be proved with "unmistakable clarity." This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism... . [M]any veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings... . [T]here will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law... . [D]eference must be paid to the trial judge who sees and hears the juror.
Wainwright, 469 U.S. at 424-25, 105 S.Ct. at 852-53, 83 L.Ed.2d at 851-53; Pinkney v. State, 538 So.2d 329, 345 (Miss. 1988) (judgment vacated and case remanded in light of Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); Lockett v. State, 517 So.2d 1317, 1335 (Miss. 1987); Fuselier v. State, 468 So.2d 45, 53-54 (Miss. 1985). Jurors who oppose the death penalty or believe it unjust may, however, serve as jurors in capital cases "so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." Lockhart v. McCree, 476 U.S. 162, 176, 106 S.Ct. 1758, 1766, 90 L.Ed.2d 137, 149-50 (1986). In Davis v. Georgia, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976) (per curiam), the Court established a per se rule "requiring the vacation of a death sentence imposed by a jury from which a potential juror, who has conscientious scruples against the death penalty but who nevertheless under Witherspoon is eligible to serve, has been erroneously excluded for cause." Gray v. Mississippi, 481 U.S. 648, *1112 659, 107 S.Ct. 2045, 2052, 95 L.Ed.2d 622, 633-34 (1987) (citing Davis, 429 U.S. at 123-24, 97 S.Ct. at 400, 50 L.Ed.2d at 342.)
In Gray v. State, 472 So.2d 409, 421 (Miss. 1985), the Court cited its Armstrong v. State, 214 So.2d 589, 593 (Miss. 1968) opinion for the steps the courts should use to follow Witherspoon:
The proper method of bringing the death penalty to the attention of the special veniremen is for the trial judge to inform them that they have been summoned as veniremen in a capital case and that a verdict of guilty could result in the infliction of the death penalty. The judge should then ask them if any member of the panel has any conscientious scruples against the infliction of the death penalty, when the law authorizes it, in proper cases, and where the testimony warrants it. If there are those who say that they are opposed to the death penalty, the trial judge should then go further and ask those veniremen, who have answered in the affirmative, whether or not they could, nevertheless, follow the testimony and the instructions of the court and return a verdict of guilty although that verdict could result in the death penalty, if they, being the judges of the weight and worth of the evidence, were convinced of the guilt of the defendant and the circumstances warranted such a verdict. Those who say that they could follow the evidence and the instructions of the court should be retained, and those who cannot follow the instructions of the court should be released. The mere fact that a venireman is opposed to the death penalty does not disqualify him as a juryman, if he can do his duty as a citizen and juror and follow the instructions of the court, and where he is convinced of the defendant's guilt he can convict him although the verdict of the jury may result in the death penalty's being inflicted upon the defendant.
Gray, 472 So.2d at 421.
The juror in question unequivocally stated that she opposed the death penalty and would not impose the death penalty under any circumstances. Additionally, the juror stated she would not follow the court's instructions. The responses of the juror in question clearly indicated that her views on the death penalty would have prevented, or substantially impaired her performance of duty in accordance with the law and her oath. Accordingly, the trial court did not err in excusing that juror for cause. This assignment is without.

IV.

The lower court erred in allowing Charles Rogers to be designated as the State's official representative, being allowed to sit at counsel table and after the Rule of Sequestration of Witnesses was invoked, being allowed to testify as a witness and a rebuttal witness for the State.
On April 18, 1990, the State filed with the trial court a document entitled "Designation of Representative." Under the authority of MRE 615 and Douglas v. State, 525 So.2d 1312 (Miss. 1988), the State designated Charles Rogers, an investigator for the Mississippi Highway Safety Department, as its representative, to be exempt from the Rule of Sequestration and remain in the Courtroom during the trial because his presence was necessary to assist the prosecution. The Judge overruled Russell's formal objection to the State's designation. Charles Rogers testified for the State during the guilt phase; he did not testify in rebuttal.
Sequestration of witnesses is addressed in MRE 615 which provides in part as follows:
At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of ... (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, ... .
The comment to the rule states, in part:
Under Rule 615 exceptions are made for several categories of witnesses... . Secondly, as the equivalent of the right of a natural-person party to be present a *1113 party that is not a natural person is entitled to have a representative present... .
This Court addressed MRE 615 in Douglas v. State, 525 So.2d 1312, 1316-17 (Miss. 1988):
Under the new MRE 615, judicial discretion is more limited than it was under our pre-Rules cases. Now sequestration is a matter of right except for the three categories of witnesses spelled out in the Rules, as evidenced by the language `at the request of a party the court shall order witnesses excluded...' except those witnesses enumerated in the Rule. This change in practice has been noted by the federal courts in construing F.R.E. 615, from which M.R.E. 615 was adopted verbatim.

* * * * * *
The Sheriff was not exempted from the Rule simply by virtue of his being the Sheriff, unless, under category (2) of the Rule's exceptions, the Sheriff is designated by the District Attorney as the state's representative because as the chief investigating officer in the case, his presence in the courtroom is necessary to assist the prosecution at trial. [emphasis added] See, e.g., Burke v. State, 484 A.2d 490 (Del. 1984); People v. Cheeks, 682 P.2d 484 (Colo. 1984) (both Delaware and Colorado have adopted F.R.E. 615 into their states' evidence rules).
Peace officers and investigating officers are included in the class of witnesses subject to exemption from the rule. See U.S. v. Adamo, 882 F.2d 1218, 1235 (7th Cir.1989); United States v. Parodi, 703 F.2d 768, 773 (4th Cir.1983); United States v. Jones, 687 F.2d 1265, 1268 (8th Cir.1982); Lewis v. State, 288 Ark. 595, 709 S.W.2d 56 (1986).
In the case sub judice, the sequestration rule was requested and granted and, upon designation by the State, Charles Rogers, as the duly designated representative of the State, was exempted from the sequestration rule. Russell concedes that the State had every right to make such a designation. Russell's complaint seems to be against the particular person designated, Chief Investigator Charles Rogers. Russell claims that allowing the chief investigator at counsel table during the trial tainted the jury deliberations by the injection of sympathy into their decision. A similar argument was made and rejected in U.S. v. Adamo, 882 F.2d 1218:
Lastly, it is urged that it was improper for Agent Simmons to sit at the prosecutor's table during trial because, according to Adamo's brief, the seating arrangement somehow resulted in the prosecutor's improper "tacit endorsement" of Agent Simmons. We note that Agent Simmons was exempt from sequestration, see Fed.R.Evid. 615(2) and (3), and that the appellant has failed to cite a single case holding that it is improper or inherently prejudicial for an investigative agent to be seated with the prosecutor during trial. Rather, the legislative history of Rule 615, and decisions in other circuits, make it clear that a governmental investigative agent, even though he is also a witness, may be designated to sit at the government counsel's table. See S.Rep. No. 1277, 93rd Cong., 2d Sess. 26 (1974), reprinted in 1974 U.S.Code Cong. & Adm.News, 7051, 7072-73. See also United States v. Perry, 643 F.2d 38, 53 (2d Cir.1981); United States v. Little, 753 F.2d 1420, 1441 (9th Cir. 1984); United States v. Shearer, 606 F.2d 819 (8th Cir.1979).
U.S. v. Adamo at 1235. This assignment is without merit.

V.

The lower court erred, in guilt-innocence stage, in sustaining State's Motion in Limine dated September 28, 1990, to exclude third party testimony concerning the victim's participation in an illegal activity at the penitentiary with third parties of a like nature as that between defendant Russell and victim Cotton, this evidence being relevant to defendant Russell' state of mind on date of Cotton's death, in violation of Mississippi Rules of Evidence, Rule 404(a)(2).
*1114 On September 28, 1990, the State filed a Motion in Limine to exclude any proposed testimony concerning bad character of the victim, Argentra Cotton, with the exception of testimony, if any, of the victim's having been the aggressor in this crime, because said testimony would be irrelevant and inadmissible under Rule 404(a)(2) of the Rules of Evidence. This motion was granted.
Russell sought to introduce testimony of two inmates regarding specific instances of Officer Cotton's prior activities in illegal contraband: (1) testimony of Ernest Shelby that Officer Cotton had supplied contraband, specifically marijuana, to him; and (2) testimony of unnamed inmates that (a) Officer Cotton had supplied batteries for a radio in violation of prison regulations and (b) Officer Cotton and Russell regularly engaged in lending each other money. Russell's purpose for offering this testimony was not as "an attempt to assassinate [the] character of Officer Cotton," but in support of three defense theories: (1) manslaughter based on the theory that because Officer Cotton failed to bring Russell his contraband, as he had done in the past, Russell had been betrayed by his friend, Officer Cotton and, in the heat of passion, Russell lost control; (2) murder less than capital based upon the subjective view, i.e., because Officer Cotton engaged in these illegal activities, in Russell's mind, Cotton was not acting in his official capacity and Russell had no knowledge that Officer Cotton was a peace officer, thereby negating the essential statutory elements of capital murder; and (3) state of mind, that is, Officer Cotton's betrayal "brought inmate Russell a state of mind that was tantamount to or was a severe or extreme emotional disturbance" which "would support that mitigating circumstance under the sentencing phase." The trial court ruled that the past conduct of the deceased was not admissible.
Russell, in fact, testified that he and Officer Cotton had struck a deal: $20.00 for several packages of yeast. Russell testified that this deal was not the first between him and Officer Cotton. Russell also testified that Officer Cotton was in uniform and that he, Russell, knew Officer Cotton was an officer of the law at the time of the stabbing. Russell offered no other testimony in his behalf.
The trial court granted jury instructions on self-defense and the lesser included offense of manslaughter.

A.
This issue concerns the exclusion of evidence via a Motion in Limine and is procedurally governed by MRE 103(a)(2). MRE 103(a)(2) provides that error may not be predicated upon a ruling which excludes evidence unless a substantial right of the party is affected and the substance of the evidence was made known to the court by an offer of proof or was apparent from the context within which questions were asked. This assignment is properly before the Court as Russell made an offer of proof to the trial court of the proposed evidence which was excluded. See Heidel v. State, 587 So.2d 835, 844 (Miss. 1991) ("Before a party may secure appellate reversal on an evidentiary exclusion, that party must have placed in the record the substance of the evidence he would have offered had the court ruled otherwise.").
"Rule 103(a), Miss.R.Ev., ... directs affirmance unless the party against whom evidence has been erroneously received has been denied a substantial right." Ponthieux v. State, 532 So.2d 1239, 1248 (Miss. 1988). This standard also applies when evidence has been erroneously omitted. Heidel v. State, 587 So.2d 835, 844 (Miss. 1991); Darby v. State, 538 So.2d 1168, 1173-74 (Miss. 1989).

B.
The excluded evidence concerned the actions of the victim, Officer Cotton; more specifically, it concerned the allegedly illegal past conduct of Officer Cotton in dealing with persons other than Russell. "Rules 404(b) and 405(b) of the Mississippi Rules of Evidence create the threshold requirement for admissibility of the type evidence in question." Day v. State, 589 So.2d 637, 641 (Miss. 1991). Once the Rule *1115 404-405 analysis is completed, the inquiry does not end; the proposed evidence must also meet the relevance and prejudice tests of MRE 401, 402 and 403. Day v. State, 589 So.2d 637, 641 (Miss. 1991); Heidel v. State, 587 So.2d 835, 845 (Miss. 1991).

C.
The excluded evidence sub judice included specific acts of the victim, Officer Cotton, with persons other than the defendant, Russell. Russell contends that when this proposed evidence is analyzed according to the purpose for which it was offered  to show the relationship between the two men and explain Russell's state of mind at the time of the stabbing  the evidence was admissible. This same argument was addressed by this Court in Day v. State, 589 So.2d 637 (Miss. 1991).
Day involved the erroneous exclusion of prior threats of the victim against the defendant offered "to demonstrate the relationship between [the defendant and the victim] and to explain why their personal relationship would have caused [the defendant] to panic or act irrationally at the time of the shooting." Id. at 641. This Court found that the offered testimony was "evidence of other acts offered for the purpose of proving something other than the victim's character," specifically, "evidence of prior acts offered as having a bearing on the accused's state of mind, an essential factor in determining whether a homicide is manslaughter or murder." Id. Under the circumstances in Day, the excluded evidence constituted an exception to the general prohibition of Rule 404(a)(2) against the use of character evidence and was admissible under MRE 404(b) and 405(b). Id. Additionally, this Court found the proffered evidence was relevant and its probative value outweighed any unfair prejudice, confusion of the issues, misleading of the jury or other MRE 403 consideration. Id. at 643-44. See also Heidel v. State, 587 So.2d 835 (Miss. 1991) (error to exclude evidence that victim wielded butcher knife two weeks prior to killing when defendant claiming self-defense and evidence relevant to show state of mind).
In accordance with the foregoing authorities, the evidence Russell sought to have admitted was "offered for the purpose of proving something other than the victim's character," specifically Russell's state of mind and, therefore, constituted an exception to the general prohibition of Rule 404(a)(2). However, there is a distinguishing factor between Day and the case sub judice, namely, the person towards whom the victim's prior acts had been directed. In Day, the victim's acts were directed towards the defendant and were, therefore, relevant and admissible to show the relationship between the victim and the defendant and, more particularly, to show the defendant's state of mind, not the victim's character. In the case sub judice, the victim's acts were directed toward third parties and offered to show Russell's state of mind, not the victim's character. In fact, Russell's proposed state of mind evidence presents the flip side of the prohibited activity of Rule 404(a) [showing conformity with a character trait] in that Russell's proposed state of mind evidence depended upon showing non-conformity with a character trait.
Russell contends that Officer Cotton's non-conformity with his character trait of engaging in illegal activity directly contributed to Russell's state of mind; ergo, while Russell argues that Officer Cotton's character is not in issue, in reality, Officer Cotton's character, and his non-conformity to that character, is in issue. Thus stated, it seems that Russell is indirectly attempting to put Officer Cotton's character trait for illegal activity in issue. The argument then becomes circular: if the evidence of Officer Cotton's character trait is offered to show Russell's state of mind, then the evidence would be admissible if the requirements of MRE 405(b), 401, 402 and 403 are met.
There is another twist to this assignment. Russell requested, and was granted, a jury instruction S-3 on self-defense. Under the self-defense theory as presented by Russell, before any character evidence would be admissible, Russell would have to offer evidence of an overt act perpetrated *1116 against him by Officer Cotton. MRE 404(a) Comment. To this end, Russell testified that Officer Cotton put his hand in his pocket, at which time Russell became apprehensive. This testimony placed into doubt, however slightly, the identity of the initial aggressor. See Heidel v. State, 587 So.2d 835, 845 (Miss. 1991) and cases cited therein. Having offered that testimony, evidence of Officer Cotton's character was admissible if such evidence was offered in the proper form and relevant. See Shinall v. State, 199 So.2d 251 (Miss. 1967).

D.
Evidence of character, and specific acts of the victim towards the defendant, offered to show the defendant's state of mind are admissible. "Once the question of admissibility of character evidence is resolved under Rule 404, it is necessary to turn to Rule 405 for the correct methodology." MRE 405 Comment. Russell sought to prove his state of mind  rage and therefore heat of passion defense  through evidence of specific instances of conduct of Officer Cotton. Specific instances of conduct are governed by Rule 405(b), which "is reserved for those cases in which character is an essential part of the issue. In this situation, proof of specific instances of conduct may be introduced into evidence. Evidence of specific conduct is limited to cases in which character is in issue." Rule 405, Comment.
Assuming that Officer Cotton's character is in issue and an essential element of the defense of heat of passion, proof of specific instances of conduct would be admissible. The question is whether the victim's specific acts towards third parties, as testified to by those third parties, is admissible to show the defendant's state of mind towards the victim.
"Details of a previous difficulty between the deceased and a third person prior to the homicide is inadmissible to show bad character of the deceased. [citations omitted]." Shinall v. State, 199 So.2d 251, 258 (Miss. 1967). Likewise, "[t]hreats made by deceased against persons other than accused are inadmissible." Walker v. State, 140 Miss. 238, 105 So. 497 (1925). Accordingly, evidence of specific acts of the deceased toward third parties are not admissible to show bad character of the deceased or non-conformity therewith.
We note that the evidence discussed herein may well have been admissible during the sentencing phase had Russell re-offered it. See Mackbee v. State, 575 So.2d 16, 39-40 (Miss. 1990) and cases cited therein.

VI.

Whether the lower court erred in failing to allow Defendant Russell to introduce proof of threats to defendant Russell by organized gangs in Parchman in order to show Russell's state of mind in the guilt-innocence stage of the trial.
This assignment also concerns the exclusion of evidence  threats from third parties [gang members] against Russell  via a Motion in Limine and procedurally governed by MRE 103(a)(2). This assignment is properly before the Court as Russell made an offer of proof to the trial court of the proposed evidence which was excluded. See Heidel v. State, 587 So.2d 835, 844 (Miss. 1991).
Evidence of threats by Officer Cotton towards Russell would have been relevant on the issues of state of mind of Russell and identity of the first aggressor. Day v. State, 589 So.2d 637, 644 (Miss. 1991); Heidel v. State, 587 So.2d 835, 845 (Miss. 1991) and cases cited therein. However, threats made by the deceased against persons other than the defendant are inadmissible, Walker v. State, 140 Miss. 238, 105 So. 497, 498 (1925) as are difficulties between the deceased and persons other than the defendant, Shinall v. State, 199 So.2d 251, 258 (Miss. 1967) and difficulties between the defendant and third parties. Carter v. State, 167 Miss. 331, 145 So. 739 (1933). Accordingly, the trial court did not err in excluding evidence of gang threats against Russell.

*1117 VII.

Whether the lower court erred, in the guilt-innocence stage of Russell's trial, in allowing over defendant's objections, the use of Defendant's taped and transcribed statements for impeachment purposes in violation of the United States Constitution, the Mississippi Constitution of 1890 and the Mississippi Rules of Evidence, Rule 608.
Russell gave taped statements to Officer Charles Rogers on July 18, 1989, and July 27, 1989. Because the statements were taken after impermissible re-initiation, Kirkland v. State, 559 So.2d 1046 (Miss. 1990), the trial court ordered both statements suppressed as to the State's case in chief but not suppressed as to rebuttal or impeachment testimony. The State used portions of the July 27, 1989, statement for impeachment purposes during cross-examination of Russell.
Russell is not challenging the trial court's determination that his prior statement was not hearsay under MRE 801(d)(2)(A), he challenges its use for impeachment purposes because the question of the voluntariness of the statement had not been addressed. "It is hornbook law, firmly embedded in the case law of this State, that unsworn prior inconsistent statements may be used for impeachment of the witness' credibility regarding his testimony on direct examination." Moffett v. State, 456 So.2d 714, 719 (Miss. 1984). "[But impeachment] does not mean that the out-of-court statement became evidence on its merits or has any probative value. The rule seems to be universal that the impeaching testimony does not establish or in any way tend to establish the truth of the matters contained in the out-of-court statement." Id. at 719-20, quoting Magee v. Magee, 320 So.2d 779, 783 (Miss. 1975).
This is the first time the question of voluntariness of the July 27, 1989, statement has been raised in connection with its impeachment use; at trial, Russell challenged impeachment use of his prior statement only on the grounds of authenticity. "It is elementary that different grounds than the objections presented to the trial court cannot be presented for the first time on appeal." Thornhill v. State, 561 So.2d 1025, 1029 (Miss. 1989).
Russell also challenges the use of the statement for impeachment purposes because no limiting instruction was given. "[T]he function of the prior inconsistent statement is to impeach the credibility of the witness' direct testimony." Moffett v. State, 456 So.2d 714, 720 (Miss. 1984). The statement used for impeaching should not be given to the jury, and a limiting or explanatory jury instruction that impeaching goes only to credibility and cannot be considered as substantive evidence is proper. Id.
No limiting instruction regarding the impeachment testimony was granted in the case sub judice because no limiting instruction regarding the impeachment testimony was requested. Additionally, review of the record shows that Russell did not object to the guilt phase jury instructions as given. Therefore, since the contemporaneous objection rule is applicable in capital cases, Cole v. State, 525 So.2d 365, 369 (Miss. 1987), the issue of lack of jury instruction is without merit.

VIII.

Whether the culmulation (sic) of errors in Russell's trial requires the guilty verdict and sentence of death be reversed.
Russell is seeking reversal of the guilt phase based upon cumulative error, namely, all the assignments of error heretofore discussed. He contends that this Court should consider all errors at trial for their accumulative effect in accordance with "our familiar rule:
It is true that no one of these errors, when considered separately and apart from the others, is sufficient to justify a reversal of the case, but when they are considered as a whole it is out view that they resulted in the appellant being denied a fair trial... .
Hansen v. State, 592 So.2d 114, 142 (Miss. 1991) quoting Russell v. State, 185 Miss. 464, 469, 189 So. 90, 91 (1939).
*1118 In accordance with this Court's standard of review for all cases in which the sentence of death as been imposed, see Balfour v. State, 598 So.2d 731, 739 (Miss. 1992) we have carefully and thoroughly examined the guilt phase of Russell's trial and find no error, nor cumulation of error, requiring reversal. Accordingly, Russell's conviction of capital murder is affirmed.
CONVICTION AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN, BANKS and McRAE, JJ. concur.
PITTMAN, J., not participating.

SENTENCING PHASE

IX.

Whether the lower Court abused its discretion in failing to determine defendant Russell's habitual-offender status prior to the capital sentencing stage of defendant Russell's capital murder trial in violation of the United States Constitution and the Mississippi Constitution of 1890.

X.

Whether the Lower Court erred in granting State's Motion in Limine to prohibit the discussion of "life sentence", where defendant Russell is indicted as an habitual offender and no determination of habitual offender status was made prior to the sentencing stage of trial.
Russell was indicted as an habitual offender pursuant to Miss. Code Ann. § 99-19-83 (1972). However, because Russell was sentenced to death, no hearing was held in accordance with Rule 6.04, Uniform Criminal Rules of Circuit Court Practice, to determine his status as an habitual prior to the sentencing phase of his capital murder trial, nor was the jury instructed regarding the meaning of "life."
Such was the case in Turner v. State, 573 So.2d 657 (Miss. 1990). In Turner this Court changed the procedure for capital murder cases when the defendant is charged as an habitual offender to require that the habitual offender status hearing be held prior to the sentencing phase so that the jury may have the benefit of the meaning of "life" and the defendant's (non) possibility for parole. Turner, 573 So.2d at 675. See also Berry v. State, 575 So.2d 1, 13-14 (Miss. 1990); Mackbee v. State, 575 So.2d 16, 38-41 (Miss. 1990); Ladner v. State, 584 So.2d 743, 759 (Miss. 1991). The driving force behind the change in procedure was the desire that the sentencing jury have before it all relevant and "accurate sentencing information [which] is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die." Mackbee, 575 So.2d at 41, quoting Gregg v. Georgia, 428 U.S. 153, 190, 96 S.Ct. 2909, 2933, 49 L.Ed.2d 859 (1976). The knowledge that the alternative to death is a life sentence, without the possibility of probation or parole is the type relevant and accurate sentencing information to which our cases speak and which every jury faced with the determination of life or death is entitled to consider.
The remedy for failure to conduct the habitual offender status hearing prior to the sentencing phase and failure to properly instruct the jury on the meaning of "life" is to vacate the death sentence and remand for new sentencing trial with proper instructions. Turner, 573 So.2d at 675. See also Berry v. State, 575 So.2d 1, 13-14 (Miss. 1990); Mackbee v. State, 575 So.2d 16, 41 (Miss. 1990); Ladner v. State, 584 So.2d 743, 759 (Miss. 1991).
Judicially enunciated rules of law are enforceable from the date of enunciation to all actions pending, but not final, on the decision date and to all actions filed thereafter. Griffith v. Kentucky, 479 U.S. 314, 323, 107 S.Ct. 708, 713, 93 L.Ed.2d 649 (1987); Cain v. McKinnon, 552 So.2d 91, 93 (Miss. 1989). Turner was decided on Petition for Rehearing December 12, 1990. Russell was sentenced October 5, 1990; his motion for new trial was overruled October 16, 1990. Although review of a death sentence is automatic, Miss. Code Ann. § 99-19-105 (date) (Supp. 1991), Russell timely filed his Notice of Appeal October 26, 1990. Russell's case was on appeal at the time *1119 Turner was decided by this Court. Therefore, the decision in Turner is applicable to this case.
No habitual offender status hearing was held in Russell's case. Likewise, the jury was not instructed regarding the meaning of "life." Accordingly, under the authority of Turner these issues have merit and require that the sentence of death be vacated and the case remanded for a new sentencing hearing under proper instructions.
CONVICTION AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN, BANKS and McRAE, JJ. concur.
PITTMAN, J., not participating.
SENTENCE OF DEATH VACATED; AND CASE REMANDED FOR NEW SENTENCING TRIAL.
HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN and BANKS, JJ., concur.
PITTMAN, J., not participating.
ROY NOBLE LEE, C.J., dissents, with separate written opinion, joined by McRAE, J.
PITTMAN, J., not participating.
ROY NOBLE LEE, Chief Justice, dissenting:
I do not agree that the lower court abused its discretion in failing to determine Russell's habitual-offender status prior to the capital sentencing stage in his capital murder trial and I further do not agree that the lower court erred in granting the State's motion in limine to prohibit the discussion of "life sentence". Therefore, I dissent.
The same questions were before the Court in Turner v. State, 573 So.2d 657 (Miss. 1990), Berry v. State, 575 So.2d 1 (Miss. 1990), Mackbee v. State, 575 So.2d 16 (Miss. 1990) and Ladner v. State, 584 So.2d 743 (Miss. 1991). I dissented in each of those cases, beginning with Turner, Supra, and adopt my dissents in those cases on the questions.
McRAE, J., joins this opinion.